Robert B. REICH, Secretary of the Department of Labor, Plaintiff,

v.

VALLEY NATIONAL BANK OF ARIZONA, Kroy Inc., Kroy Inc. Employee Stock Ownership Plan, Errol W. Bartine, James P. Fitzpatrick, John M. Glitsos, Randall E. Gnant, Kim D. Gustafson, David Gustafson, David D. Kielty, Vittal G. Srimushman, Defendants.

No. 89 Civ. 8361 (CBM).

United States District Court,
S.D. New York.

Sept. 10, 1993.

Leslie C. Perlman, Eric G. Serron, Office of Sol., U.S. Dept. of Labor, Washington, DC (Suzanne Windle, Maria Makris–Gouvas, on brief), for Dept. of Labor.

Arthur P. Greenfield, Jeffrey Walsh, Snell & Wilmer, Phoenix, AZ (Gilbert B. Weiner, of counsel), for Valley Nat. Bank.

## AMENDED OPINION

MOTLEY, District Judge.

This is an action brought by the Secretary of Labor against Valley National Bank of Arizona (Valley) and others. In this suit the Secretary of the Department of Labor (DOL) alleges, inter alia, that when Valley served as fiduciary to the Kroy Inc. Employee Stock Ownership Plan, Valley breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. Both parties have submitted cross-motions for summary judgment on the breach of fiduciary duty claim and several other claims asserted against Valley. In addition, Valley has interposed numerous counterclaims and affirmative defenses which the Secretary seeks to dismiss. The parties have stipulated to certain facts. However, in order to decide the pending motions, it has been necessary for the court to make additional findings. For the reasons set forth below, the court grants the Secretary's motions and denies the cross-motions of Valley. Damages in the amount of $17,500,000 are awarded to the Secretary. The action with respect to all other defendants has been settled.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In December of 1986 the upper-level management officers of Kroy, Inc., took the company private in a management-led leveraged buyout ("LBO"). In order to finance this transaction, Kroy created an Employee Stock Ownership Plan ("ESOP") which upon creation purchased $35.5 million worth of Kroy shares.

An ESOP is an employee benefit plan designed to invest primarily, or when certain safeguards are present, solely in securities issued by the sponsoring company. Under ERISA, ESOPs are subject to a web of rules and regulations governing their creation, maintenance, and administration. Congress has favored ESOPs with preferential treatment under the Internal Revenue Code that renders the sponsoring company eligible for bountiful tax benefits.

An ESOP is typically established by an employer via a written instrument that defines the terms of the Plan and the rights of participants therein, usually called the "Plan documents". See 29 U.S.C. § 1102(a) (1976). A trust is established to hold the assets of the ESOP, see 29 U.S.C. § 1103, and fiduciaries are named within the Plan Documents to "control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

An employer may then make tax-deductible contributions to the ESOP in the form of employer securities or outright cash. Typically, when cash is disbursed the ESOP will then use those moneys to purchase securities in the sponsoring employer. In many instances the ESOP finances its purchase of employer securities with debt, then uses the cash contributions from the employer to retire that debt. (See *Donovan v. Cunningham*, 716 F.2d 1455, 1458–59 (5th Cir.1983).

Sections 406(a)(1)(A) and (D) of ERISA, 29 U.S.C. § 1106(a)(1)(A) and (D), prohibit an Employee Stock Ownership Plan from acquiring stock or other marketable obligations of the plan sponsor from a party in interest unless the transaction qualifies under the exemption provided for in ERISA § 408(e), 29 U.S.C. § 1108(e). This exemption is allowed for qualifying employer securities if and only if the purchase is for "adequate consideration."

ERISA 3(18)(B), 29 U.S.C. § 1002(18)(B), defines "adequate consideration" in the case of assets for which there is no generally recognized market as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary...." See also 29 C.F.R. § 2550.408(e).

The Secretary of Labor alleges that when Valley served as the trustee of the Kroy Employee Stock Ownership Plan, Valley breached its fiduciary duties under ERISA in connection with the Kroy LBO. Valley allegedly breached its duty by causing the ESOP to purchase stock in Kroy, the ESOP sponsor, without the ESOP obtaining adequate consideration for the purchase.

Specifically, the Secretary claims that Valley breached its fiduciary duties under

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act prudently and solely in the interest of the plan participants and beneficiaries by, among other things, failing to conduct a good faith independent investigation of the buyout transaction to determine whether the transaction was fair to the ESOP and the price being paid for the stock was no more than fair market value, acquiring the stock at a price that was more than fair market value, and consenting to an allocation of Kroy stock between the ESOP and other investors which was not substantially fair to the ESOP in light of the equity contributions to the buyout by the ESOP and other investors. The Secretary also claims that, by permitting the ESOP to purchase Kroy shares for more than "adequate consideration" within the meaning of ERISA § 3(18), 29 U.S.C. § 1002(18), Valley caused the ESOP to engage in various prohibited transactions in violation of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1).

(Consolidated Brief in Support of the Secretary's Cross–Motion for Summary Judgment and in Opposition to Valley's Motion for Summary Judgment, 2).

Valley answered on June 29, 1990, and asserted in its defense numerous counterclaims and affirmative defenses, many of which are the subject of the instant motions.

Before the court are: 1) the Secretary's motion for partial summary judgment on some of its claims against Valley; 2) Valley's motion for partial summary judgment against the Secretary's claims against Valley for money damages; 3) Valley's cross-motions for summary judgment on its counterclaims and affirmative defenses; and 4) motions by the Secretary to dismiss Valley's counterclaims under F.R.Civ.P., Rule 12(b)(6) as well as Rule 12(f) motions to strike Valley's affirmative defenses.

The Secretary has moved, pursuant to F.R.Civ.P. 56(c), for summary judgment as a matter of law, alleging that Valley, as trustee of the Kroy ESOP, failed to arrive at a good faith determination of the fair market value of the stock it caused the ESOP to purchase. The Secretary claims that it merits summary judgment on the ground that as trustee Valley failed to make a prudent decision because it did not understand what it was doing and how the transaction affected the interests of the ESOP participants and beneficiaries. Valley vigorously opposes this motion.

Valley has cross-moved for summary judgment on this claim, arguing that there was no loss to the ESOP and, therefore, monetary liability cannot attach to the fiduciary. The Secretary vigorously opposes this motion. An evaluation of the validity of these interrelated claims first requires an understanding of the factual context in which the Kroy ESOP was created.

*The Preliminary Investigation of a Leveraged Buy–Out (LBO)*

Kroy, Inc. was in the printing and typography business. It designed, constructed, marketed, and distributed lettering systems and operated several retail copy centers. During the late 1970s and early 1980s Kroy prospered. (Korsvik Memorandum, 5, attached as Ex. C to the Secretary's Response to Valley's Rule 3(g) Statement ("Korsvik Memorandum"). However, by the mid–1980s Kroy's fortunes declined as competition from competing businesses established by former Kroy employees cut into Kroy's sales and profitability. (Id.)

In February of 1986, Kroy's Board of Directors began to review available options for improving Kroy's financial status. (1986 Kroy, Inc. Proxy Statement: Special Meeting of Shareholders to be Held on December 18, 1986, at 10, attached as Ex. 79 to Memorandum in Support of Secretary's Motion). The Board concluded that it would explore the possibilities of creating an employee stock ownership plan. (Id. at 11). In May of 1986 Kroy retained Banker's Trust Company to investigate the feasibility of this option. (Id.).

In response to their deteriorating economic viability, Kroy management developed in early 1986 a strategy to take the company private via a leveraged buy-out of Kroy, Inc's publicly-held shares. (Memorandum in Support of Valley's Motion for Partial Summary Judgment, 3; Bartine Aff. ¶¶ 2–3, Ex. 1 to Rule 3(g) Statement of Defendant Valley).

The Kroy management group proposed to the Board on July 11, 1986, that the Board purchase all of Kroy's outstanding shares on behalf of a management-led leveraged buyout. (Id.) Participants in the Kroy LBO included Kroy senior management, some outside investors and lenders, and the ESOP, which was created specifically to facilitate the LBO. (Memorandum in Support of Valley's Motion for Partial Summary Judgment at 3.)

The inclusion of the ESOP was central to the proposed LBO transaction. The motivating factor behind the creation of the ESOP was the fact that its creation would significantly lower the costs to Kroy of the LBO. If not for the congressionally-accorded tax benefits of creating an ESOP, the transaction would not have gone forward. "The ESOP was created by Kroy's management for one reason and one reason alone—it made available to Kroy much desired below interest rate financing for a large portion of the purchase price for the publicly held stock it was to acquire in the leveraged buyout." (Memorandum in Support of Valley's Motion for Partial Summary Judgment, 2–3; Bartine Aff., Ex. 1 to Rule 3(g) Statement of Valley in Support of Its Motion for Summary Judgment).

The LBO transaction was commenced in August of 1986, when Kroy's senior management and some outside investors incorporated Kappa Acquisition Corporation ("Kappa"), an entity created solely to facilitate the LBO. Kappa's only employees were its officers, who were also Kroy management officials. (Memorandum in Support of Valley's Motion for Partial Summary Judgment at 3–4).

Kappa established the Kappa Employee Stock Ownership Plan ("Kappa ESOP") soon after the incorporation of Kappa to which Kappa made no contributions. (Memorandum in Support of Valley's Motion for Partial Summary Judgment at 4). Kappa and Kroy then merged and formed Kroy, thus inducting Kroy employees as participants in the

Kappa ESOP, which after the merger became known as the Kroy ESOP. (Id).

*The Appointment of the Initial Trustees and Their Resignation*

During July of 1986 Kroy appointed three management officials, Nancy Van Der Voort, Thomas Connoy, and Ken McCuskey to serve as trustees for the newly-created ESOP (Stipulation of Undisputed Facts, ("Stip.") ¶ 12). They served until early December of 1986 when they resigned because of difficulties in obtaining fiduciary liability insurance. (Memorandum in Support of DOL's Motion For Partial Summary Judgment at 5; Connoy Dep. of June 16, 1992 at 34–36, 65, attached as Ex. 7 to Valley's Response to the DOL's Rule 3(g) Statement; McCuskey Dep. of June 25, 1992, at 39–40, 44, attached as Ex. 8; Van Der Voort Dep. of June 17, 1992, at 58, attached as Ex. 9).

Before their resignation, these newly-appointed trustees did not negotiate the price to be paid by the ESOP for the outstanding stock; rather, Bankers Trust determined what price the ESOP would pay for its stock before their appointment as trustees. (Affidavit of Nancy Van Der Voort, ¶¶ 5–6, attached as Appendix A to Secretary of Labor's Rule 3(g) Statement; Memorandum in Support of the Secretary of Labor's Motion for Partial Summary Judgment, 3–4).[1]

The original trustees first met on July 18, 1986. (Meeting Minutes of July 18, 1986, attached as Ex. 11 to Valley's Response to the DOL's Rule 3(g) Statement). During this and the following meetings, the original trustees considered applications for the positions of legal counsel and financial advisor to the ESOP. (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 6–10). One applicant, James H. Zukin of the firm of Houlihan, Lokey, Howard & Zukin, was not retained as financial advisor due to the fact that the original trustees believed that his personality would lead to difficult negotiations. (Minutes

---

1. Shearson Lehman Brothers had also been approached by Kroy but after an initial review of the proposed transaction had expressed skepticism over the feasibility of the leveraged buyout based on Kroy's lack of financial success in the years immediately prior to the proposed LBO and because the LBO was based on income projections which were "a significant departure from historical results." (April 19 Letter to John Lovett, attached as Ex. 228 to the Secretary's Rule 3(g) Statement in Support of Motion for Partial Summary Judgment).

of August 11, 1986 Meeting, attached as Ex. 14 to Valley's Response to the DOL's Rule 3(g) Statement; Spector Dep. of January 23, 1991, at 173–74, attached as Ex. 10). Mark Lee of Benchmark Valuation Consultants was favored because they considered "Mr. Lee's substantially lower fees as indicative of his confidence that he could accomplish the task on a time efficient basis." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, at 10; Minutes of August 18, 1986 Meeting, Ex. 15 to Valley's Response to the DOL's Rule 3(g) Statement).

On behalf of the original trustees Scott Spector of Webster & Sheffield attempted unsuccessfully to negotiate a lower price for the ESOP by obtaining 265,000 more shares for the ESOP. (Spector Dep. of March 5, 1992, at 89–90, attached as Ex. 10 to Valley's Response to the DOL's Rule 3(g) Statement). Indeed, the original trustees relied completely on Mr. Spector to negotiate on behalf of the ESOP, as they were "inexperienced ESOP trustees." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 12).

Due to their inability to obtain fiduciary liability insurance, the three original trustees officially resigned on December 17, 1986, effective as of December 5, 1986. (Memorandum in Support of DOL's Motion For Partial Summary Judgment, 5).

*The Search for Financing*

First Bank Minneapolis (FBM) was the leading bank involved in financing the Kroy ESOP LBO transaction. FBM invited Valley's commercial division to participate in a $35.5 million credit facility by lending between $5 million and $15 million to Kroy for the LBO, the loan to be secured by a first security interest in Kroy's assets. (Korsvik Memorandum, 1–3; September 23, 1986 Letter from FBM to Valley, Ex. 28 to Secretary's Rule 3(g) Statement).

Scott Korsvik, an employee of Valley's Commercial Division, analyzed the feasibility and desirability of participating in the Kroy ESOP financing. He reviewed the July 1986 Direct Placement Memorandum, the July 14, 1986 Kroy Transaction Memorandum, Kroy's Fiscal 1986 Review and Fiscal 1987 Outlook, Kroy's 1986 Annual Report and Form 10–Q filed with the Securities and Exchange Commission in June 1986, Banker's Trust Revised Projections, and Kroy's 1984 and 1985 Annual Reports. (See, e.g., Korsvik Memorandum; Ex. 28, 29 to Secretary of Labor's Rule 3(g) Statement). Valley's Commercial Division also conducted direct interviews with Kroy personnel. (Korsvik Dep. of Feb. 21, 1991, 40–48, attached as App. E to Secretary's Rule 3(g) Statement).

After a detailed analysis, Scott Korsvik recommended that Valley decline to participate in the proposed financing. In reaching this conclusion he cited these factors: (1) Kroy's sales had declined steeply between 1984 and 1986; (2) new competitors had entered the field; (3) present operations did not generate enough cash flow to finance the debt required to finance the LBO; (4) Kroy proposed to finance the LBO through developing new technology and increased sales instead of through current sales. (Korsvik Memorandum, 1).

Tom Wojcik, Korsvik's direct supervisor and the Vice–President and Manager for Valley's Metropolitan Banking Department, reviewed Korsvik's recommendation and concurred in Korsvik's determination that Kroy's declining sales and falling profitability rendered it unlikely that Kroy could service the debt it would incur as a result of the LBO. (Wojcik Dep. of March 28, 1991, 10–12, 15, 32–36, 39, App. D to Secretary's Rule 3(g) Statement).

Finally, Dave Tininenko, Valley's Vice–President and Manager of its United States Banking Division, reviewed Korsvik's analysis that Wojcik forwarded to him, and agreed with the analysis. (Tininenko Dep. of March 27, 1991, 28–30, 34, attached as App. F to Secretary of Labor's Rule 3(g) Statement).

As a result, Valley declined to participate as a lender in the LBO financing. In addition, because he apparently believed that the risk in the LBO transaction rendered participation in the financing unwise, Tininenko appended to the bottom of the credit review memorandum the following: "I would be interested to see if First does this deal or how/why it makes sense?? (sic)" (Korsvik

Memorandum; Tininenko Dep. of March 27, 1991, at 30).

*Valley Enters the Deal as Trustee*

On December 10, 1986, Korsvik notified Valley's trust department and informed Russell Gunderson ("Gunderson") that Kroy was looking for a corporate trustee to look out for the interests of the ESOP in the LBO transaction. (Stip., ¶ 20; Korsvik Dep. of Feb. 21, 1991, at 77–79, App. D to Secretary's Rule 3(g) Statement; Gunderson Dep. of Feb. 5, 1991, 60–62, App. H to id.). Gunderson was told by Korsvik that the Commercial Department had declined the offer to participate in the financing of the LBO. (Id., at 73). Gunderson did not ask why the bank declined the offer to participate, although Gunderson did receive and review a copy of the Commercial Division's credit review analysis. (Id. at 73–75).

Gunderson's job at Valley was to act on referrals for potential business coming to the Trust Department and he was neither expected to nor did he know how to review stock valuations. (Gunderson Dep. of Feb. 5, 1991, at 23; Gunderson Dep. of Feb. 6, 1991, at 4, both attached as App. H to Secretary's Rule 3(g) Statement). Robert Johnson, the Executive Vice–President in charge of the Trust Department at Valley, characterized Gunderson as Valley's "chief employee benefit salesperson." (Johnson Dep. of December 12, 1990, at 19–20, Supp.App. K to Secretary's Motion for Partial Summary Judgment; see also Hegeman Dep. of February 20, 1991, at 20, Supp.App. C to id.). Gunderson testified that his work experience prior to coming to Valley was as a salesperson. (Gunderson Dep. of June 25, 1987, at 11, Supp.App. A to id.).

At the time that he became the successor trustee, Gunderson's experience with trusts was limited to his reading and review of 600 or so custodial trust documents (Gunderson Dep. of June 25, 1987 at 29–30; Gunderson Dep. of February 5, 1991, at 10; Gunderson Dep. of February 3, 1992, at 105; all attached as Supp.App. A to id.).

Gunderson was told by Jim Fitzpatrick at Kroy on December 16, 1986, that Valley's proposal concerning the terms on which Valley would serve as trustee was acceptable. (Gunderson Dep. of June 25, 1987, at 31–32, attached as Ex. 19 to Valley's Response to the Department of Labor's Rule 3(g) Statement). At the time that Valley accepted this position, it had never before served as a trustee in connection with a multi-investor ESOP-financed leveraged buyout such as the Kroy LBO. (Johnson Dep. of December 12, 1990, at 56, Supp. K to Supplemental Appendix to the Secretary's Motion for Partial Summary Judgment).

*The Actions of Kappa's Law Firm, Patterson, Belknap, Webb & Tyler*

After its creation as a mechanism to facilitate the LBO, Kappa hired the law firm of Patterson, Belknap, Webb & Tyler ("Patterson") to advise it. (See, e.g., Memorandum in Support of the Secretary's Motion to Strike, 4).

The DOL had established a procedure in 1976 by which persons may obtain opinion letters from the Secretary on certain issues arising under ERISA: ERISA Procedure 76–1. The scope of issues for which such opinion letters would be given was limited. ERISA Proc. 76–1 § 5.02(a) stated, for example, that the Secretary will not ordinarily issue advisory opinions regarding ERISA "section 3(18) relating to whether certain consideration constitutes adequate consideration." Valley's ESOP counsel, the law firm of Webster & Sheffield, knew of this limitation, and advised Valley that "the DOL has announced that it will not issue advisory opinions concerning whether the adequate consideration requirement has been met in any particular case. Section 5.02(a) of ERISA Procedure 76–1, 41 Fed.Reg. 36,281, 36,282 (August 27, 1976)." (December 23, 1986 Letter of Webster & Sheffield to the Trustees of the Kappa Acquisition Corp., 18, Ex. B to the Secretary's Memorandum in Support of Motion to Strike).

Nevertheless, Patterson had developed a practice of submitting to the DOL information regarding proposed LBOs involving the creation of ESOPs in which Patterson was involved. Patterson submitted documents regarding the Kroy LBO to DOL employees "for informal review" on behalf of Kappa.

(See Counterclaim ¶ 23; Memorandum in Support of Secretary's Motion to Strike at 5).

Virginia Bartlett, a DOL staffperson, is described by Valley as the alleged "contact person" at the Department for this alleged "informal review." Valley claims that this informal pre-closing review found nothing wrong with the LBO and gave the transaction the DOL's implicit approval.

Bartlett worked at the DOL in the Division of Investigations of Pension Welfare Benefits Administration ("PWBA") as a senior investigator. (Lerner Declaration, ¶ 5, App. A to the Secretary's Response to Valley National Bank's Rule 3(g) Statement ("Lerner Decl."). She lacked the legal authority to approve or disapprove the LBO transaction and so bind the DOL. (Lerner Decl. ¶ 5). Internal regulations of the DOL, Chapter 14, para. 21 of the PWBA Compliance Manual, forbid employees from publicly discussing "whether or not an investigation is underway or even under consideration." (Lerner Decl. ¶ 6).

Valley claims had it known the Secretary would object to the transaction and bring the instant action, it never would have gone through with the deal and would have refrained from serving as trustee for the ESOP.

The Office of Enforcement, Division of Investigations of the PWBA, DOL, opened an investigation of the Kroy LBO on November 21, 1986. (Lerner Decl. ¶ 1). This investigation was not yet completed when the transaction closed on December 23, 1986. (Lerner Decl. ¶ 1; Consolidated Brief in Support of The Secretary's Cross–Motion for Summary Judgment and in Opposition to Valley's Motion for Summary Judgment, at 5). This investigation into the LBO was not completed until late 1987. (Lerner Decl. ¶ 1).

No written approval was ever given Valley or any other participant in the LBO transaction, at any time, by the Secretary notifying interested parties that the DOL would take "no action" with respect to the ESOP's participation in the Kroy LBO transaction. (Lerner Decl ¶ 4; Consolidated Brief in Support of The Secretary's Cross–Motion for Summary Judgment and in Opposition to Valley's Motion for Summary Judgment, at 6). Indeed, Valley, in support of its motions, appends as evidence of DOL approval various letters written by Patterson to DOL staffers. No answer from the DOL is included in the vast record supporting the instant motions.

*Gunderson's Efforts*

On December 11, 1986, Gunderson spoke to James Fitzpatrick, Kroy's Vice–President of Finance, who gave him some background information on the proposed LBO; specifically, Gunderson stated that he was sent a draft of the ESOP document and trust agreement and a copy of the proxy statement. (Gunderson Dep. of Feb. 5, 1991, 61–68, 83–88; Gunderson Dep. of June 25, 1987, 25–26, 34, both attached as App. H to Secretary's Rule 3(g) Statement; Memorandum in Support of DOL's Motion For Partial Summary Judgment, 10). Gunderson reviewed no other documents prior to this time. (Gunderson Dep. of February 5, 1991, at 117–119, Supp. App. A to Secretary's Motion for Partial Summary Judgment). Fitzpatrick told Gunderson via telephone on December 16, 1986, that Valley's bid to serve as trustee had been accepted by Kroy. (Gunderson Dep. of Feb. 5, 1991, 89, App. H to Secretary's Rule 3(g) Statement). On this date, the LBO transaction was scheduled to close roughly three days later, on December 18, 1986. (See Memorandum in Support of DOL's Motion For Partial Summary Judgment, 11).

Gunderson flew to New York City in the afternoon of December 16, 1986 (Stip. ¶ 32). The next day Gunderson spent in the offices of Patterson, the New York law firm that represented Kroy's management. (Gunderson Dep. of Feb. 5, 1991, 117–19). During the morning Gunderson again reviewed the plan and trust documents. At lunch he met for the first time with Scott Spector of the law firm of Webster & Sheffield, and Mark Lee of Benchmark Valuation Consultants, the lawyer and valuator hired by the original trustees. (Stip. ¶¶ 35–36). At this lunch Gunderson received for the first time the Benchmark Report. (Stip. ¶ 40). The Benchmark Valuation Report was one of the key documents relied upon by Gunderson.

Benchmark's Valuation Report noted that the following documents were reviewed while

making its analysis: (1) SEC Forms 10–K for the five-year period through March 29, 1986; (2) SEC Forms 10–Q for the period ending September 27, 1986; (3) Kroy's Annual Reports for the five-year period ending March 29, 1986; (4) Kroy's most recent proxy statement; and (5) the financial projections created by Kroy management for use in the ESOP LBO. (Benchmark Valuation Report, 2, Ex. 38A of the Secretary's Rule 3(g) Statement). Mark Lee did not utilize or review Kroy's financial plan for the 1987 fiscal year which was prepared by Kroy's manager of Financial Analysis, created in October of 1986. (Affidavit of Mark Bowker (Bowker Aff.) ¶ 13, App K to id.; Declaration of Bridget Lundahl (Lundahl Decl.) ¶¶ 4–8, App Q to id.). Benchmark did not independently assess whether or not Kroy could meet the sales projections upon which the LBO was predicated. (Lee Dep. of July 12, 1991, at 11, App. L to id.). For example, Kroy's distributors made negative comments regarding Kroy and its products, comments that were not investigated by Benchmark. (See id.; Ex. 38A to id.).

During that afternoon Gunderson read Benchmark's Draft Valuation Report. He testified that he did not review the Benchmark report page by page with Mark Lee but instead discussed it in "general terms" only. (Gunderson Dep. of February 4, 1992, at 358, App. H to Secretary's Rule 3(g) Statement). Gunderson testified that instead of making an independent analysis, he relied upon the assurances supplied by Lee and Benchmark. (Gunderson Dep. of February 3, 1992, at 263; Gunderson Dep. of February 4, 1992, both App. H to id.) Gunderson knew that as a trustee he had a fiduciary duty to make an independent assessment of the benefits and detriments to the ESOP of participating in the LBO transaction. (Gunderson Dep. of February 6, 1991 at 95–96., App H to id.).

At this time Gunderson did not realize that the $5.92 price per share to be paid by the ESOP included some premium for control. (Gunderson Dep. of February 3, 1992, at 266–67, id.). Webster & Sheffield's legal opinion did not address whether the ESOP would be able to exercise control in fact.

(See Ex. 37 to Secretary's Rule 3(g) Statement).

Gunderson never contacted the original trustees to ascertain their opinion about the LBO or to determine what efforts they made, if any, to negotiate the terms of the ESOP's participation in the LBO transaction. (Van Der Voort Aff. ¶ 18, Van Der Voort Dep. of June 17, 1992, at 115, both in App. A to Secretary's Rule 3(g) Statement; Connoy Aff. ¶ 2, Connoy Dep. of June 16, 1992, at 96, both App M to id.; McCuskey Dep of June 25, 1987, at 63–64, McCuskey Dep. of June 25, 1992, at 78–79, both App. N to id.; Gunderson Dep. of February 3, 1992, at 222–52, App H to id.). Valley admittedly never met with the prior trustees to ascertain what investigation the prior trustees had undertaken. (Gunderson Dep. of February 3, 1992, at 222–252 (Supp.App. A to Secretary's Motion for Partial Summary Judgment). Additionally, Gunderson testified that he had not reviewed copies of the minutes of all the meetings of the original trustees. (Id. at 248–250).

Both Lee and Spector mentioned to Gunderson the fact that the prior trustees had attempted to negotiate more shares for the ESOP for the price to be paid. (Spector Dep. of March 5, 1992 at 90, Ex. 10 to Valley's Response to the Department of Labor's Rule 3(g) Statement). Gunderson did not attempt on behalf of Valley to undertake any negotiations for the ESOP; rather he stated that he thus "concluded from these discussions that further attempts to negotiate the price to be paid by the ESOP were not apt to be fruitful." (Gunderson Dep. of February 4, 1992 at 458–59, Ex. 19 to id.).

Gunderson did not visit the premises of Kroy. He never read the relevant corporate governance documents, and never interviewed Kroy management. (Gunderson Dep. of Feb. 4, 1992 at 391, Gunderson Dep. of February 3, 1992 at 191, 277, 279, App. H to Secretary's Rule 3(g) Statement; Van Der Voort Aff. ¶ 18). While Valley contends that Gunderson met with Errol Bartine to discuss, on December 18, 1986, the involvement of the Kroy management group in the LBO transaction (See Valley's Memorandum in Opposition to Secretary's Motion for Partial

Summary Judgment at 21–22), Gunderson testified that at that time the substance of their discussion was limited to Bartine's expressing interest in having Kroy's payroll account handled by Valley (Gunderson Dep. of June 25, 1987, at 116–17, Supp.App. A to the Secretary's Motion for Partial Summary Judgment), an encounter that Gunderson later described as taking "10, 15 minutes at the most." (Gunderson Dep. of February 4, 1992, at 326, Supp.App. A to id.). Bartine testified that he did not recall any direct discussions with any personnel from Valley prior to the closing of the LBO transaction on December 23, 1986. (Bartine Dep. of February 14, 1992, at 199, Supp.App. S to id.).

Gunderson reviewed the existing Plan documents and decided that the prior negotiations had produced a deal favorable to the potential ESOP participants. (Rule 3(g) Statement of Valley in Support of its Motion for Partial Summary Judgment, ¶ 20; Gunderson Dep. of 6/25/87, 14–15).

There is some dispute as to how extensively Gunderson discussed with Lee the Benchmark Valuation Report. The evidence indicates that Gunderson's review of, and for that matter understanding of, the Benchmark Valuation Report, was shallow at best. While Lee did testify on behalf of Valley that Gunderson "grilled him" and asked many questions (Lee Dep. of July 12, 1991 at 21, Ex. 16 to Valley's Response to the DOL's Rule 3(g) Statement), Lee could not recall discussing any of the following subjects with Gunderson: (1) the relative provisions of the different classes of stock (Lee Dep. of July 11, 1991, at 11, Supp.App. J to Secretary's Motion for Partial Summary Judgment); (2) Kroy's three year projections (id. at 20); (3) whether the ESOP should negotiate any of the terms of the Kroy LBO transaction (id. at 53, 58); (4) voting or nomination and removal of directors, (id. at 72–74); (5) the relative value of what the ESOP received compared to that received by other cash investors (id. at 185); (6) what due diligence Benchmark had conducted and how up to date and complete the information relied upon by Benchmark was (Lee Dep. of July 12, 1991, at 12, 16, Supp.App. J to Secretary's

Motion for Partial Summary Judgment); (7) or Kroy's ten-year projections (id. at 111).

All told, even when considered in a light most favorable to Valley, Gunderson spent at most a total of eight hours with Spector and four hours with Lee. In contrast to their behavior before the commencement of this litigation, Valley's prudence expert, Jeffrey Clayton, testified that in preparing his testimony he spent over 100 hours reviewing the records. (Clayton Dep. of October 2, 1992, at 624, Supp.App. O to Secretary's Motion for Partial Summary Judgment).

Gunderson also knew that Valley had been approached to participate in financing the LBO but did not provide a copy of Valley's analysis to either of his advisors so that they could consider this fact. (Spector Dep. of March 6, 1992 at 186–89, App. O to Secretary's Rule 3(g) Statement; Lee Dep. of July 11, 1992 at 223–26, App. L to id.). While there is some dispute as to whether the concerns raised by the Korsvik Memo were discussed at all with Valley's advisors, what is admitted by Valley is that none of the parties supposedly acting on behalf of the ESOP believed that Valley's doubts about the viability of the Kroy LBO raised "cause for concern about the proposed ESOP investment in the LBO." (Spector Dep. of March 6, 1992, at 186–88, Ex. 10 to Valley's Response to the DOL's Rule 3(g) Statement; Lee Dep. of July 11, 1991 at 224–25, Ex. 16 to id.; Gunderson Dep. of June 25, 1987, at 58–59, Ex. 19 to id.). "Valley's decision not to participate in the Kroy loan was of little significance to Valley's decision as trustee to the Kroy ESOP." (Valley's Memorandum in Opposition to the Secretary's Motion for Summary Judgment; Clayton Dep. of October 1, 1992, at 432–35, Ex. 20 to Valley's Response to the DOL's Rule 3(g) Statement).

Gunderson testified that he "reviewed Mr. Korsvik's memorandum, [but] discounted its conclusions because the memorandum did not directly address the issue under consideration, namely whether the investment opportunity presented to the Kroy ESOP was a good one." (Valley's Memorandum in Opposition to the Secretary's Motion for Summary Judgment at 53–54; Gunderson Dep. of June 25, 1987, at 58–63, Ex. 19 to Valley's Re-

sponse to the DOL's Rule 3(g) Statement). Valley notes that Mark Lee of Benchmark testified that even had he reviewed the Korsvik memorandum he would have ignored it. (Valley's Memorandum in Opposition to the Secretary's Motion for Summary Judgment at 54). Valley relied on the review of the transaction conducted by Benchmark (Id. at 33) and, as noted, took no independent steps to investigate the transaction on behalf of the ESOP, even though they, themselves, had declined to put any of their own capital at risk because they believed the deal to be unwise (Korsvik Memorandum).

Lee and Spector both testified that they were unaware of the fact that Valley previously had been presented with an opportunity to participate in the Kroy LBO as a secured lender but had declined after review of the transaction. (Spector Dep. of March 6, 1992, at 186–89, Supp.App. F to the Secretary's Motion for Partial Summary Judgment; Lee Dep. of July 11, 1991, at 223–26, Supp.App. J to id.).

*The Deal Goes Through*

There was an attempt to close the LBO transaction on December 19, 1986, at the law offices of Battle Fowler. (Gunderson Dep. of June 25, 1987 at 69–70, App. H to Secretary's Rule 3(g) Statement). In mid-afternoon of December 19, Gunderson was notified that the closing was to be postponed at the request of another investor. In the evening of December 19, 1986, he flew back to Phoenix. (Gunderson Dep. of Feb. 3, 1992 at 223–30; Gunderson Dep. of June 25, 1987 at 69–71, all App. H to Secretary's Rule 3(g) Statement). The transaction closed on December 23, 1986.

In the LBO the publicly-held shares were purchased for $78.0 million, $35.5 million from a loan from First National Bank of Minneapolis collateralized with Kroy assets; $25 million from a subordinated loan from Quest Entities, not a party to the current action; $4.5 million from cash invested by senior management of Kroy and other investors; and the purchase of warrants by Quest and cash on hand from Kroy. (See Memorandum in Support of Valley's Motion for Partial Summary Judgment at 4–5; Amended Complaint ¶ 15).

Kroy then immediately turned around and sold six million shares of class A common stock to the ESOP, with the ESOP paying for the stock with two promissory notes made payable to Kroy in the amount of $35.5 million. (Class A Common Stock Purchase Agreement, Ex. 4 to Valley's Response to DOL's Rule 3(g) Statement).

These promissory notes were non-recourse notes and were secured by the unallocated stock sold by Kroy to the ESOP. Kroy committed itself to make contributions to the ESOP in the amount needed to service the notes. The ESOP was in turn obligated under the Plan documents to return this money to Kroy in repayment of its debt. (Bartine Aff., ¶ 6, Ex. 1 to Valley's Response to DOL's Rule 3(g) Statement). The ESOP's obligation to pay Kroy was derivative to Kroy's obligation to make contributions in the amount necessary to service its debt to the ESOP. (Id. at ¶ 10). By using this method of financing Kroy was able to secure significant tax advantages.

By creating the ESOP, Kroy was able to significantly lower the after-tax cost of the LBO. First National Bank Of Minneapolis then reflected the value of the tax break by reducing the interest rate on the loan to Kroy. (Memorandum in Support of Valley's Motion for Partial Summary Judgment at 6). Kroy was able to get a lower rate on its $35.5 million loan by passing on the debt to the ESOP which it created specifically for this purpose. (Id.; See also Bartine Aff. ¶ 8).

*Kroy Collapses*

From 1987 to 1990, Kroy made contributions into the ESOP in the amount of $17.5 million which the ESOP then used to repay its loan from Kroy. (Memorandum in Support of Valley's Motion for Partial Summary Judgment at 7).

Kroy, unfortunately, was not able to survive the general economic contraction of the late 1980's. The downward trend of Kroy pointed out in the Korsvik Memorandum continued as predicted until Kroy self-destructed in debt. All available revenues had to be allocated to meet expenses and service the debt incurred by the LBO. Finally, on May 15, 1990, Kroy filed under Chapter 11 of the

Bankruptcy Code for protection from its creditors. (See Bartine Aff. ¶ 11, Ex. 1 to Valley's Rule 3(g) Statement). In August of 1990, the ESOP sold its Kroy stock to Red Oak Investment Corporation for $250,000 pursuant to order of the Bankruptcy Court. (Memorandum in Support of Valley's Motion for Partial Summary Judgment at 8).

The instant lawsuit was brought on December 18, 1989, by the Secretary against Valley as trustee of the Kroy ESOP and other parties involved in the transaction. All of the other defendants other than Valley have settled.

THE CLAIMS OF THE PARTIES

Pending before the court are motions by both remaining parties for summary judgment on various claims and counterclaims and by the Secretary to strike Valley's affirmative defenses and counterclaims. These motions fall into two categories: those concerning the Department's claims against Valley and those concerning Valley's counterclaims and the affirmative defenses it asserts against the Department. For the sake of convenience the motions concerning the Department's claims against Valley shall be dealt with first.

I. **THE SECRETARY'S MOTION FOR SUMMARY JUDGMENT AND VALLEY'S "NO LOSS" DEFENSE**

The Department of Labor has moved for partial summary judgment on its claims

> against Valley National Bank with respect to paragraphs 40–42 of the Secretary's Amended Complaint which allege that Valley caused the Kroy Employee Stock Ownership Plan ("ESOP") to engage in a non-exempt prohibited transaction in violation of ERISA §§ 406(a)(1)(A), (B) and (D), 29 U.S.C. §§ 1106(a)(1)(A), (B) and (D), by causing the ESOP to purchase Kroy shares for more than "adequate consideration" as defined in ERISA § 3(18), 29 U.S.C. § 1102(18).

**2.** Valley has opposed this motion and submitted its motion for partial summary judgment on the claim that the Secretary is not entitled to damages on the grounds that "the ESOP and its participants suffered no 'loss,' and Valley cannot

(Notice of Secretary's Motion for Partial Summary Judgment, 1; Amended Complaint ¶¶ 40–42).[2] The Department's claim is that Valley breached its fiduciary duty to the ESOP by causing it to pay more than adequate consideration for the Kroy stock it purchased. "Adequate consideration" is statutorily defined as follows: "in the case of an asset other than a security for which there is a generally recognized market, [as] the fair market value of the asset as determined in good faith by the trustee or named fiduciary." 29 U.S.C. § 1002(18)(B).

Since the facts of this case are not genuinely in dispute, it is the scope of this Section that provides the battleground for the Secretary's instant motion for partial summary judgment.

The Secretary's claim contains three components:

A. Valley failed to conduct the independent good faith inquiry of the LBO transaction required by law thereby violating its fiduciary duty.

B. Due to Valley's nonfeasance, the ESOP did not get adequate consideration for its outlay.

C. As a result, loss was caused to the ESOP in the amount of $17.5 million dollars (the amount of the $35.5 million that the ESOP still owed on debt created out of the LBO) minus $250,000 (the amount that the ESOP sold its stock pursuant to order of the Bankruptcy Court overseeing the Kroy bankruptcy) plus interest.

The Secretary's motion for partial summary judgment argues that the undisputed facts demonstrate that Valley failed to arrive at a "good faith determination of the fair market value of the stock it caused the ESOP to purchase" because when it caused the ESOP to purchase the shares as trustee of the ESOP, Valley could not make a prudent decision because it did not understand what it was "doing and why it [was] in the interests of the plan participants and benefi-

be held answerable in damages without a loss having occurred." (Memorandum in Support of Valley's Motion for Partial Summary Judgment, 2). This countermotion will be discussed below.

ciaries." (Memorandum in Support of the Secretary's Motion for Partial Summary Judgment, 2).

Thus two requirements are imposed: fair market value and good faith. The DOL contends that the "adequate consideration" exemption to the general prohibition against a Plan acquiring the stock of a sponsoring employer applies only where (1) the price paid by the ESOP reflects the fair market value of the asset and (2) the trustee or named fiduciary conducts a careful, independent and good faith investigation of the circumstances prevailing at the time of the valuation. (Secretary's Reply to Valley's Opposition to the Secretary's Motion for Partial Summary Judgment at 39). Valley contends that the exemption applies if the trustee either causes the ESOP to pay adequate consideration *or* if a good faith inquiry into valuation is conducted. The court need not decide between these two formulations since it is clear from the evidence adduced by both parties that adequate consideration was not paid and that a good faith inquiry into the transaction was not made.

The Legal Standards for Summary Judgment

F.R.Civ.P. 56(c) authorizes the granting of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Secretary asserts that its motion should be granted because Valley's evidence is not sufficiently probative to create a genuine issue of material fact. It is clear from the evidence that the Secretary is correct.

"By its very terms, this standard provides that the mere existence of some *alleged* dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986) (emphasis in original). If the evidence is merely colorable or not signifi-

cantly probative, summary judgment may be granted. *Id.,* 477 U.S. at 249–50, 106 S.Ct. at 2511, 91 L.Ed.2d at 212. In regard to the Secretary's motion for partial summary judgment, there are no sufficiently probative and genuine issues of material fact to prevent the issuance of summary judgment for the Secretary.[3] While all doubts are to be resolved in favor of nonmovants, "the plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and upon which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986).

■ A fiduciary like Valley who claims that ERISA §§ 408(b)(3) and (e), 29 U.S.C. §§ 1108(b)(3) and (e), exempt such a transaction from the prohibitions of ERISA § 406(a)(1)(A), (B) and (D) has the burden of proving by a fair preponderance of the credible evidence that the stock was purchased for no more than "adequate consideration" within the meaning of ERISA section 3(18). *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1215, (2d Cir.1987); *Donovan v. Cunningham,* 716 F.2d 1455, 1467–68 (5th Cir.1983); *Marshall v. Snyder,* 572 F.2d 894, 900 (2d Cir.1978). To meet its burden in opposing the Secretary's motion for summary judgment as the party bearing the burden of proof on the adequate consideration issue, "Valley must prove that it arrived at its determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Donovan,* 716 F.2d at 1467–68. Gunderson's admissions, in addition to the rest of the evidence, demonstrate that Valley, by failing to take any independent steps, by failing to understand the basis for and the evidence used to create the Benchmark Report, and by failing to take the steps enumerated in the Spector Opinion, failed to arrive at a determination of fair market value by way of a prudent inves-

---

**3.** Indeed, there is a remarkable lack of disagreement as to the material facts. What is in dispute are the legal inferences to be drawn from these largely undisputed facts.

tigation into the circumstances then prevailing.

### The Statute at Issue and the Applicable Legal Standard Thereunder

#### The Prudent Person Standard.

■ ESOP trustees are fiduciaries and must discharge their duties "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). A fiduciary's duties under ERISA are "the highest known to law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir.1982). Prudence is measured according to the objective prudent person standard developed in the common law of trusts. *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.), cert. den. 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

The trustee must "prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir.1983).

"A fiduciary's *independent* investigation of the merits of a particular investment is at the heart of the prudent person standard." *Whitfield v. Cohen*, 682 F.Supp. 188, 194 (S.D.N.Y.1988) (emphasis supplied).

■ "A trustee's lack of familiarity with investments is no excuse." *Katsaros v. Cody*, 744 F.2d at 279. As noted in *Donovan v. Cunningham*, 716 F.2d at 1467, a "pure heart and an empty head are not enough." A trustee must make reasonable investigation into the representations of interested parties and where that investigation would have revealed evidence that the investment was unsound, the trustee can be held liable. *Katsaros v. Cody*, 744 F.2d at 279. Here, Valley relied on an analysis by Benchmark that utilized projections and assumptions supplied by Kroy and which did not undertake even minimal independent investigations such as contact with those who had dealings with Kroy which would have revealed the riskiness of the Kroy LBO transaction to any would-be investor.

ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), is a more stringent version of the prudent person standard than in the common law of trusts. *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir.1983). "Prudence is measured according to the objective 'prudent person' standard developed in the common law of trusts." *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984). "[R]ather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility." *Central States Pension Fund v. Central Transport*, 472 U.S. 559, 570, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447, 457 (1985) (emphasis in original) (citations omitted).

■ This is an objective standard that focuses on the conduct of the fiduciary causing the ESOP to make the investment. Thus even though Congress endorses the use of ESOPs and has implemented this policy via the tax codes, a trustee still must, before causing the ESOP to invest in employer stock for which there is no generally recognized market, conduct a good faith inquiry subject to close scrutiny under the prudent person standard. See *Fink v. National Savings Bank*, 772 F.2d 951, 955 (D.C.Cir.1985); *Eaves v. Penn*, 587 F.2d 453, 459 (10th Cir. 1978).

#### The Mere Fact That the ESOP was Created as a Mechanism to Finance the LBO Does Not Excuse the Trustee's Failure to Exercise Prudence in Regard to Investing the ESOP's Assets.

The ESOP's obligation to make payments on its promissory notes was effective under the Plan documents only upon contributions being made by Kroy to the ESOP. Thus, the ESOP obtained its six million shares without any initial cash outlay. (See ESOP Loan "A" and "B" Agreements, Ex. 5, 6 to Valley's Response to the Government's Rule 3(g) Statement).

ESOPs are, as Valley notes, a favored mechanism for giving employees an interest

in their company. ESOPs are intended to serve as significant sources of capital for the sponsoring company. Like any source of financing, ESOPs are subject to the inherent risk of stock ownership. There are, of course, significant rewards as well as significant risks, depending upon the market performance of the stock in which the ESOP has invested.

Valley asserts that it "approached the decision as to whether to allow the ESOP to participate in the Kroy LBO mindful of its fiduciary responsibilities *and* aware that the adoption of the ESOP was consistent with the Congressional goal of employee participation in stock ownership of the employer, and that without participation in the LBO the ESOP would not be funded." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 50 (emphasis in original)). However, the duty of a fiduciary is solely directed toward the interests of the Plan participants. The implementation of Congressional policy is not the concern of an ESOP trustee.

As the Secretary notes, it is irrelevant how the ESOP got the $35.5 million in cash in regard to the question of whether the ESOP paid more than fair market value for the stock. If the investment is not prudent, the fiduciary duty owed by Valley is not to invest, even if without that decision the ESOP would not be created. Valley cannot excuse a poor investment by claiming that the ESOP would not exist if not for the imprudent decision to make that investment.

Judicial Review of ESOP Transactions

The task of the District Court is to review the challenged transaction in order to determine whether the trustees, "at the time they engaged in the challenged transaction, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola,* 716 F.2d 1226, 1232 (9th Cir.1983), cert. den. 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir.), cert. den. sub nom. *Cody v. Donovan,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Fink v. National Savings & Trust Co.,* 772 F.2d 951, 955 (D.C.Cir. 1985); *Donovan v. Cunningham,* 716 F.2d at

1467. It is clear from the record that in the LBO transaction Valley was not prudent, did not use the appropriate methods to investigate the merits of the transaction and thus violated its fiduciary duty under ERISA.

The Duty to Conduct an Independent Review and Investigation

A. Independent Appraisals.

"An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Cunningham,* 716 F.2d at 1474.

"While a trustee has a duty to seek independent advice where he lacks the requisite education, experience and skill, the trustee, nevertheless, must make his own decision based on that advice." *Whitfield v. Cohen,* 682 F.Supp. 188, 194 (S.D.N.Y.1988) (citations omitted). Here, Valley did not even seek *independent* advice. The use of Benchmark's Report, which relied solely on representations by Kroy, and Spector's Opinion, whose mandate Gunderson did not fulfill and who was hired by Kroy management officers, amounts to *dependent* advice.

Case law makes crystal clear that passive acceptance of reports do not immunize trustees from ERISA liability. The trustees in the case of *Katsaros v. Cody* were found liable because "they passively received a superficial picture of the [business they caused the pension fund to invest in] and its holding company from persons with an interest in obtaining their approval. No effort was made to obtain independent professional assistance or analysis of the financial data presented to them." *Katsaros v. Cody,* 744 F.2d at 275.

In *Katsaros,* whose facts are quite parallel to the case at bar, the trustees were found liable for investing in a business that had never earned the amount of money that would be needed to finance the debt they proposed to take on. Additionally, there was nothing in that business' current finances that would suggest that they would be able to achieve the needed earnings in the future. *Katsaros,* 744 F.2d at 276. In Kroy's case not only did Kroy's past earnings not suffice

to cover the debt they intended to take on, but, in addition, Valley's own investigation raised as the major reason for not investing in the LBO this very inability. (Korsvik Memorandum, 1).

### B. Cannot Rely Solely On Advice Of Advisors.

■ Neither the Benchmark valuation opinion nor the Spector opinion analyzed the terms of the loan. As testified to by Gunderson, no one at Valley made any efforts whatsoever to undertake an independent analysis of the loan terms; instead, Valley, as the ESOP trustee, relied solely on the representation by the company as to the fairness of the agreement and the loan terms. (Gunderson Dep. of June 25, 1987, 113–14). To contend that this action constitutes prudence seems remarkable; after all, how many people or institutions would undertake a $35 million investment in a company (which for the ESOP was the entirety of its investments) based solely on representations by the company as to its health and the fairness of the deal by which the investment was made?

Gunderson testified that the efforts made to determine that adequate consideration was given were limited solely to relying upon Benchmark's Valuation Report (Gunderson Dep. of Feb. 3, 1992, at 205–06). A fiduciary cannot rely on a financial or legal opinion without understanding the basis for the recommendations therein which was clearly the case.

### C. Cannot Rely On Legal Counsel.

Valley contends that Webster & Sheffield provided a formal legal opinion and reached the "opinion that the ESOP transaction did not violate ERISA." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 24).

Webster & Sheffield allegedly signed off on the investment as follows:

Likewise, in view of the determination of the Trustee based on the written report of Benchmark that the purchase price of the Stock is fair to the Trust and that the investment in the Stock is prudent, and in view of the determination of the Trustee

that the investment in the Stock is consistent with the Plan's objectives, primarily for the benefit of and protective of the interest of participants, it is our opinion that the initial acquisition of the Stock does not violate the duties imposed on fiduciaries by ERISA.

To claim that this constitutes approval is to be guilty of an extraordinary misreading. First, it assumes the Benchmark Report is valid and ignores the duty of the trustee to independently assess its validity. Secondly, it ignores the fact that the Benchmark Report explicitly analyzed the investment in terms of its investment value, not in terms of its fair market value. Third, it states that the Trustee has already determined that the investment is primarily for the benefit of Plan participants. Fourth, and most telling, the Opinion is based on the following: "the determination of the Trustee based on the written report of Benchmark." Essentially, this Opinion is saying the investment is legally sound because the trustee has determined it is sound because the investment advisor has determined it is sound. It says too much but proves nothing. It implies that the Trustee has already determined the fairness of the investment based on a reasoned analysis of the facts; it is not in itself an approval of the deal.

Valley cannot claim that it was entitled to rely on the advice of its legal counsel because Gunderson failed to perform the tasks that his legal counsel directed him to perform. Gunderson first met Scott Spector of Webster & Sheffield and Mark Lee of Benchmark Valuation Consultants on December 17, 1986, in New York City. Both men had been hired by the original management trustees. (Stip. ¶ 14; Gunderson Dep. of Feb. 6, 1991, 9, App. H to Secretary's Rule 3(g) Statement). On December 18, 1986, Gunderson reviewed Spector's legal opinion but did not examine it on a page by page basis and review it with Spector. (Gunderson Dep. of Feb. 3, 1992, at 196, Id.).

The Webster & Sheffield legal opinion prepared by Spector (Ex. 37 to Valley's Response to the Government's Rule 3(g) Statement) enumerated a variety of tasks to be

performed by the ESOP trustee in order to fulfill its fiduciary duty. One such duty was to review "the terms and interest rate of the loan [to determine that they] are reasonable and at least as favorable to the Trust as the terms of a comparable loan resulting from arms-length negotiation between independent parties." (Spector Opinion at 13).

Spector's Opinion assumed that in "considering the purchase of the stock, the Trustee has met with Benchmark to explore the rationale of its opinion. We understand that the Trustee has also made such inquiries as it deemed relevant." (Spector Opinion at 22). However, no one made any independent inquiries, no one, that is, except for the investment officers of Valley, who after conducting such an investigation concluded that the risk was a poor one and the investment bad. (Korsvik Memorandum).

The Webster & Sheffield Opinion specifically advised Valley of its duty to make an independent investigation into the merits of the transaction. Gunderson was told that Valley would have to make its own independent decision regarding prudence, fair market value, and the advisability of the ESOP purchasing the Kroy stock. (Supp.App. F to Secretary's Motion for Partial Summary Judgment, Spector Dep. of March 6, 1992, at 173–76). Valley's right to rely on the Spector Opinion depended upon Valley first performing the tasks enumerated therein and Valley failed to do so.

Especially remarkable is Gunderson's failure to make efforts to assure that Kroy could meet its substantial debt burdens, a failure all the more noteworthy due to Valley's own reluctance to invest its own funds in the transaction for that very reason. In essence, all Mr. Gunderson did was come into a transaction whose closing was imminent and close the transaction.

### D. Cannot Rely On Benchmark, The Financial Advisors.

Lee failed to make an adequate investigation. As stated by Lee, Benchmark's Report was based almost completely on information provided by the company and it assumed the truth of those representations. There was no independent exploration into the truth of Kroy's assertions. (Lee Dep. of July 12, 1991, at 11, App. L to Secretary's Rule 3(g) Statement). Thus, Valley caused the ESOP to invest based on a report and on representations by the subject of the investment, Kroy, Inc. This reliance assumed not only that investment in Kroy was suitable but also that the price paid was reasonable and appropriate. Gunderson admitted that he was not "an evaluation expert," that he did "not have an evaluation background," and that he "relied on Mark Lee and Benchmark to supply [him] with the assurances and the opinion if I ran into an appropriate price." (Gunderson Dep. of Feb. 3, 1992, at 263). Gunderson could not independently understand or verify the conclusions reached by his financial advisors, as he also testified that since he knew little about valuation, he could not understand how Benchmark, a firm which Valley played no role in hiring in the first place, reached the conclusions it did. (Gunderson Dep. of Feb. 4, 1992, 335–36, 342). Valley relied on a report produced by a firm it did not hire (but was instead hired by management officials of Kroy (Stip. ¶ 17)), which it did not understand, and which relied only on representations made by the company.

When it was Valley's own money at stake, it did not hire a consultant to advise it. Valley instead undertook a detailed, independent analysis, thoroughly investigated Kroy's prospects, critically examined Kroy's representations and statements, and ultimately declined to participate as lender to the LBO. Yet when Valley was in charge of investing someone else's money, it did none of this. Not only did it not utilize its own financial analysis of Kroy, Valley did not even show it to its own financial advisor.

Benchmark had three tasks: To determine (1) Fair market value as of 12/22/86 of 6,000,000 shares of Kroy; (2) The fairness, "from a financial point of view, in light of the total consideration and future benefits to be received by the Plan, of the price to be paid for the Shares"; and (3) The prudence, from a financial point of view, under ERISA, of the Trustee in causing the transaction. (Ex. 31 to Valley's Response to the Government's Rule 3(g) Statement, Benchmark Report of 12/22/86 and Supplement of 12/23/86).

According to Valley, Benchmark concluded that (1) the ESOP shares had a "fair market value of at least $5.92 per share and that the six million shares of Class A common stock had a fair market value of at least $35.5 million; (2) the purchase price paid by the trustee was fair; and (3) the purchase of the shares by the trustee at the purchase price of $5.92 per share was not imprudent." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 31).

Valley claims that the "price paid by the ESOP for the acquired stock was decided by Valley as trustee, with the advice of Benchmark. This price was negotiated on the ESOP's behalf by Scott Spector prior to Valley's trusteeship." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 31–2, Ex. 10 to Valley's Response to the Government's Rule 3(g) Statement, Spector Dep. of March 5, 1992 at 86–89).

However, Lee of Benchmark admitted that the total dollar amount to be paid by and the equity allocation to be received by the ESOP had already been determined when he was retained as the ESOP's financial advisor in August of 1986. (Supp.App. J to Secretary's Motion for Partial Summary Judgment, Lee Dep. of June 22, 1987, at 28).

Additionally, the Benchmark Report did not entitle Valley to rely upon it for it did not ascertain whether the ESOP was paying "fair market value." The Benchmark Report specifically limited its analysis of the deal to an investigation of whether the price of $5.92 per share was justified on "the same terms and conditions as sold to the ESOP." (Ex. 38A to the Secretary's Rule 3(g) Statement, Benchmark Report of Dec. 23, 1986, at 2). Thus, instead of determining the fair market value of the stock, Benchmark's Valuation Report discussed the investment value of the stock to the ESOP.

According to the Benchmark Report, it was fair for the ESOP to purchase the Kroy stock at $5.92 per share because the ESOP obtained stock with a post-transaction value of $0.69 per share and a contribution obligation of $5.92 per share. Thus the "total indicated value" of the stock amounted to $6.61 per share. (Benchmark Report at 42). Utilizing this methodology, Benchmark thus *automatically and necessarily* concluded that the price obtained by the ESOP was fair. No matter how much the ESOP paid, this method of analysis would generate a fair price. Benchmark has conceded as much. (Supp.App. J to Secretary's Motion for Partial Summary Judgment, Lee Dep. of June 22, 1987, at 115–16).

Valley's own expert has admitted that no cash or cash-equivalent purchaser would have paid $5.92 per share for Kroy stock. (Supp.App. T to Secretary's Motion for Partial Summary Judgment, Pratt Dep. of Sept 2, 1992, at 199, Pratt Dep. of Sept. 3, 1992, at 421–22).

E. Gunderson Failed To Independently Assess Or Understand The Financial Information Presented To Him.

Valley claims that it was entitled to rely on Benchmark's review. However, the evidence indicates that Valley did not spend much time or energy reviewing either Benchmark's analysis or that of Webster & Sheffield. When Gunderson met with Lee and Spector in New York, the meeting was also attended by representatives of Kroy management. There was little or no discussion of the particulars of the transaction at this meeting. (Supp.App. A to Secretary's Motion for Partial Summary Judgment, Gunderson Dep. of Feb. 5, 1991, at 120; Supp.App. F. to id., Spector Dep. of March 6, 1992, at 105–10, 114–15).

F. Valley Cannot Rely On The Work Of Prior Trustees.

Valley claims that it was entitled to piggyback on the efforts of the original trustees. Valley says it was able to build upon these efforts and complete the due diligence on the investment without starting from the beginning. This claim is unpersuasive. If the counsel of advisors cannot be relied upon without some showing of an independent investigation, then it is even more imperative that the court not accept as exculpatory the efforts of other trustees without at least a showing that (1) The successor trustee made

efforts to assure themselves that the predecessor's work satisfied ERISA's high fiduciary standards; and (2) The efforts of the original trustees were in fact satisfactory and diligent.

While Valley may asseverate that Spector discussed general prudence requirements, the role of ESOP trustees, and the meaning of adequate consideration, fairness, and independence with the original trustees (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 7), there is no similar showing that these concepts were ever discussed with Valley. Even assuming, arguendo, that the original management trustees knew their obligations, that is irrelevant to the main issue, i.e., what did Gunderson know and do and when, why, and how did he do it?

In fact, the evidence indicates that even the original trustees' work was deficient. For example, the original trustees decided not to hire Zukin of Houlihan, Lokey, Howard, & Zukin for the position of financial advisor because they felt his personality "might lead to difficult negotiations." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, at 9; Ex. 10, Spector Dep. of Jan. 23, 1991 at 173–74). It sounds as if they did not want to have "difficult" negotiations because they too, like Valley, were predisposed to close the deal. Because of this predisposition they let this desire to close interfere with their fiduciary duties. Deposition testimony reveals that Zukin had significant reservations about the fairness of the LBO transaction to the ESOP. (Supp App. G to Secretary's Motion for Partial Summary Judgment, Zukin Dep. of July 15, 1992, at 12–14; Supp.App. F. to id., Spector Dep. of Jan. 3, 1991, at 195–96).

The Secretary argues that the amount of stock to be received by the ESOP was set in advance at 50.1%, and that the $5.92 per share price was established solely because that was the amount required to finance the leveraged buyout. (Supp.App. D to Secretary's Motion for Partial Summary Judgment, Bommarito Dep. of Feb. 5, 1992, at 104–15; Supp.App. E to id., Den Uyl Dep. of June 24, 1992, at 76–79, 86–87). At oral

argument Valley admitted as much. (Transcript of Oral Argument, 49).

Spector allegedly tried, unsuccessfully, during the fall of 1986 to negotiate 265,000 more shares of stock for the ESOP. (Ex. 10 to Valley's Response to the Government's Rule 3(g) Statement, Spector Dep. of March 5, 1992 at 89–90). The original trustees relied on Spector to negotiate for them, since they themselves were inexperienced. (Ex. 8 to Valley's Response to the Government's Rule 3(g) Statement, McCuskey Dep. of June 25, 1992, at 13–14; Ex. 9 to id., Van Der Voort Dep. of June 17, 1992, at 15; Ex. 20 to id., Clayton Dep. of Sept. 30, 1992 at 119–20 and Oct. 2, 1992 at 211–13).) The original trustees had no prior experience with the role of a fiduciary. They did not have familiarity with leveraged buyouts in general, or those involving ESOPS in particular. (Stip. ¶ 21). If Spector negotiated for the original trustees because they were too inexperienced to do so themselves, why then should Valley be entitled to rely on their work?

Additionally, the fact that the original trustees resigned because they could not obtain fiduciary liability insurance is slightly suspicious and, when added to the mass of facts, lends support to the Secretary's motion for partial summary judgment. The original trustees' instant resignation due to that failure implies that they did not trust in the legal sufficiency of their own work. The sudden desire for indemnification immediately before the LBO transaction was consummated and the subsequent resignation of the original trustees suggests that they did not measure up or at least felt they did not measure up, to the high fiduciary standards imposed by ERISA. *Donovan v. Bierwirth,* 680 F.2d 263, 276 n. 18 (2d Cir.1982). At the very least this behavior should have put Valley on notice and given Valley reason to doubt the reliability of the original trustees' work as did the original trustees themselves.

The Secretary argues persuasively that the work of the original trustees was deliberately deficient. As noted by Valley, the impetus behind the adoption and creation of the ESOP was the favorable tax treatment accorded. The Secretary points out the potential for abuse inherent in these transactions:

"the more the ESOP pays for its stock in proportion to the total debt required to finance the leveraged buyout, the more debt service expense the company can save by deducting ESOP contributions on its corporate income tax returns." (Secretary's Reply to Valley's Opposition to the Secretary's Motion for Partial Summary Judgment, 6).

Valley never contacted the original trustees. Valley cannot rely on the work of the original trustees when they never contacted these original trustees to ascertain what endeavors were made by them on behalf of the ESOP's participation in the LBO transaction. (Van Der Voort Aff. ¶ 18; Van Der Voort Dep of June 17, 1992, at 115 (App. A to Secretary's Rule 3(g) Statement); Connoy Aff. ¶ 2; Connoy Dep. of June 16, 1992, at 96 (App. M to id.); McCuskey Deps. of June 25, 1987, at 63–64, and of June 25, 1992, at 78–79 (App. N to id.))

Valley became trustee with only a week left to go before the scheduled closing. Valley admittedly never met with the prior trustees to discuss what investigation they had undertaken. (Supp.App. A to Secretary's Motion for Partial Summary Judgment, Gunderson Dep. of Feb. 3, 1992 at 222–52). Gunderson never saw copies of all of the original trustees' minutes. (id. at 248–50). Valley is not entitled to rely on this work.

### G. Valley Cannot Rely On Alleged Approval Of Department Of Labor.

Valley professes that it is entitled to rely on the approval of the transaction by the DOL. This claim is ludicrous. Valley never saw any documentation from the DOL, only representations by interested parties, especially Patterson, the law firm that represented Kroy. Valley is not entitled to rely on Patterson's representations. Valley never attempted to contact the DOL itself. There is no evidence of the DOL's approval, as will be discussed more fully when Valley's counterclaims and affirmative defenses are discussed.

Valley's assertion that it took comfort from the reviewing activities of the DOL reveals, when analyzed historically, the fact that Valley was predisposed to close on the deal.

Gunderson represented to Valley's Trust Acceptance Committee that he had actually reviewed a "no action, no comment" letter from the Department of Labor (Supp.App. V to Secretary's Motion for Partial Summary Judgment, Ex. 3; Supp.App. C to id., Hegeman Dep. of Feb. 20, 1991, at 103–09) even though he later confessed that he had *never* seen any such letter. (Supp.App. A to Secretary's Motion for Partial Summary Judgment, Gunderson Dep. of June 25, 1987, at 46–47).

Gunderson later conceded that he knew that the DOL did not and would not review pre-closing documents and approve of proposed ESOP-financed LBOs. (Supp.App. A to Secretary's Motion for Partial Summary Judgment, Gunderson Dep. of Feb. 6, 1991, at 64–67; Gunderson Dep. of Feb. 3, 1992, at 182–85).

### H. Fair Market Value Was Not Paid: Adequate Consideration Was Lacking.

The price to be paid by the ESOP for its shares was determined by Bankers Trust in advance of the appointment of the original trustees. These terms were not negotiated by the original trustees. (Van Der Voort Aff. ¶¶ 5–8, App. A to Secretary's Rule 3(g) Statement; Bartine Dep of February 14, 1992 at 57–58; Bommarito Dep. of February 25, 1992, at 38–40, 108–15).

It was Gunderson who, on December 11, 1986, contacted Vice President of Finance James Fitzpatrick at Kroy to ascertain the possibility of serving as ESOP trustee. (Gunderson Dep. of Feb. 5, 1991, 80–82). Gunderson was sent either that day or the next a draft of the plan document, the trust agreement and a copy of the proxy statement. (Admissions ¶ 34; Gunderson Dep. of Feb. 5, 1991, 61–68, 83–88; Gunderson Dep. of June 25, 1987 at 25–26, 34). After reviewing these documents, Gunderson contacted Fitzpatrick to discuss fees and was referred to Joseph Simone at Patterson Belknap. (Gunderson Dep. of Feb. 5, 1991, at 82–88; Gunderson Dep. of June 25, 1987, at 31–32). Fitzpatrick notified Gunderson on December 15, 1986, that Valley's bid to serve as ESOP trustee had been selected by Kroy. (Gun-

derson Dep. of Feb. 5, 1991 at 89). Gunderson then flew to New York City to consummate the deal.

There is no evidence that in these initial contacts Gunderson had any conversations with Kroy personnel about the substance of the proposed LBO or the ESOP investment. Additionally, Fitzpatrick at Kroy testified that his conversation with Gunderson was extremely brief. (Supp.App. M to Secretary's Motion for Partial Summary Judgment, Fitzpatrick Dep. of March 3, 1992, at 95). Gunderson admitted this, explaining that the conversation was limited to discussing Valley's fees for serving as trustee and that they did not discuss the merits of the LBO or the ESOP investment because Valley was "not talking about making a decision to proceed as a trustee because we didn't have enough information yet." (Supp.App. A to Secretary's Motion for Partial Summary Judgment, Gunderson Dep. of June 25, 1987, at 29).

The party's assertions as to the documents that Gunderson possessed prior to December 16, 1986 vary somewhat. Gunderson noted, himself, that he had only the plan and trust documents and the proxy statement. (Supp. App. A to Secretary's Motion for Partial Summary Judgment, Gunderson Dep. of Feb. 5, 1991, at 117–19).

Valley had never served previously as trustee in connection with a multi-investor ESOP-financed leveraged buyout. (Supp. App. K to Secretary's Motion for Partial Summary Judgment, Johnson Dep. of Dec. 12, 1990, 56).

On December 18, 1986, Gunderson spent the day with Lee and Spector in New York City. Spector claims he and Gunderson reviewed prior attempts to obtain more shares for the ESOP (Ex. 10 to Valley's Response to the Government's Rule 3(g) Statement, Spector Dep. of Mar. 5, 1992 at 90). Gunderson testified that from these discussions he concluded that any additional attempts on behalf of the ESOP would be fruitless. (Ex. 19 to Valley's Response to the Government's Rule 3(g) Statement, Gunderson Dep. of Feb. 4, 1992, 458–59).

These New York activities did not include a review of the Korsvik memorandum or an analysis of the reasons that induced Valley not to participate as lender in the Kroy LBO transaction. (Supp.App. F to Secretary's Motion for Partial Summary Judgment, Spector Dep. of March 6, 1992, at 186–8; Supp.App. J to id., Lee Dep of July 11, 1991, at 223–26). These concerns were seen as irrelevant. (Ex 20 to Valley's Response to the Government's Rule 3(g) Statement, Clayton Dep of Oct. 1, 1992, 432–35). "Valley's decision not to participate in the Kroy loan was of little significance to Valley's decision as trustee to the Kroy ESOP." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 21).

However, Mark Lee testified that had he known that the reason Valley declined to participate in the LBO financing was that Valley was skeptical about Kroy's ability to finance the debt it proposed acquiring, he would have felt that further investigation would have been required. (Supp.App. J to Secretary's Motion for Partial Summary Judgment, Lee Dep of July 11, 1991 at 226).

Gunderson testified that during the morning of December 17, 1986 at the offices of Patterson he spent his time working only on the plan and trust documents and did not review the particulars of the proposed LBO transaction. (Supp.App. A to Secretary's Motion for Partial Summary Judgment, Gunderson Dep. of Feb. 5, 1991 at 119).

Valley argues that the DOL elevates form over substance. It is enough, Valley contends, that the transaction result in a fair conclusion, and thus it is not mandatory that a fiduciary engage in a good faith investigation of value if the ESOP ends up paying no more than "adequate consideration." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment at 44). ERISA's Section 3(18) merely defines "adequate consideration" as the "fair market value as determined in good faith by the trustee." Valley argues that this requirement is binary and disjunctive. The Secretary argues that it is unitary and conjunctive. The Secretary's reading is clearly the correct one. A court's review of a trans-

action determines whether the price paid was adequate consideration, i.e. "the fair market value of the asset as determined in good faith." "[T]his is not a search for subjective good faith—a pure heart and an empty head are not enough." *Donovan v. Cunningham,* 716 F.2d at 1467. Alas, the record here suggests that Valley lacked even a pure heart.

■ The fairness of an investment is to be determined from the perspective of the time of the investment, not from the perspective of hindsight. *Katsaros v. Cody,.* 744 F.2d 270, 279 (2d Cir.1984). Likewise, the mere fact that the trustee utilizes the advice of outside experts does not render their conduct in bad faith. *Cunningham,* 716 F.2d at 1474. However, they must familiarize themselves with the investment so that they can make a reasoned decision. It is the careless reliance on this advice without an independent assessment of its reliability that calls for a judgment that the trustees actions were not taken in good faith. Under the objective prudence standard trustees are judged in accordance with the standard of others acting in like capacity and familiar with such matters; and thus cannot excuse their actions merely by claiming that they acted on the advice of counsel. *Katsaros,* 744 F.2d at 279.

Valley asserts that it was "entitled to review and consider the results of the detailed analysis conducted by its quite capable advisors and was not obligated to retrace all of the steps they took." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment at 53; Ex. 20 to Valley's Response to the Government's Rule 3(g) Statement, Clayton Dep. of Sept. 30, 1992 at 83–87, 107–08, 112, 173, 211–13, 258–59, 266–68, 270–71.) However, Valley was required to undertake adequate investigation into the work of their advisors so that they could make a reasoned recommendation based on that advice. This Valley did not do.

In any event, even were Valley's actions taken in good faith, they would still lose since adequate consideration was not paid.

As one court has said, "Congress [in ERISA § 406] intended to create an easily applied per se prohibition ... of certain transactions, no matter how fair, unless the statutory exemption procedures [of ERISA § 408(a) ] are followed." *Cutair v. Marshall,* 590 F.2d 523, 529–30 (3d Cir. 1979); see also *Eaves v. Penn,* 587 F.2d 453, 457–59 (10th Cir.1978). Lack of harm to the plan or the good faith or lack of same on the part of the borrower are not relevant, and certainly not controlling, under ERISA § 406. Rather, "Congress was concerned in ERISA [§ 406] to prevent transactions which offered a high potential for loss of plan assets or for insider abuse...." (*Marshall v. Kelly,* 465 F.Supp. 341, 354 (W.D.Okl.1978).

*M. & R. Invest. Co. v. Fitzsimmons,* 484 F.Supp. 1041, 1055 (D.Nev.1980).

I. As A Result Of Valley's Fiduciary Breaches, Adequate Consideration Was Not Paid.

1. Fair market value.

■ Adequate consideration "simply means fair market value, or stated another way, that the price paid was reasonable in light of what the ESOP received." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment, 2). Valley's argument appears to be that as long as the price paid was reasonable, the conduct of the trustee is irrelevant. "The transaction at issue in this case was prohibited only if the ESOP paid more than fair market value for the stock." (Id. at 3). However, by Valley's own definition, the Kroy LBO transaction was deficient as to adequate consideration, since fair market value was not paid.

The legal standard to be applied is whether Valley caused the ESOP to pay more than fair market value for the Kroy stock. In order for the transaction to fall into ERISA § 408(e)'s exemption, it must have been made for "adequate consideration." Adequate consideration is defined by ERISA § 3(18), 29 U.S.C. § 1002(18), as the "fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan."

2. Amount paid was not fair market value.

The amount paid by the ESOP for the Kroy shares did not constitute fair market

value. That much is clear from an analysis of the proposed deal performed by Benchmark. The fairness of the LBO transaction to the ESOP was analyzed by Benchmark not from the point of view of a willing cash or cash-equivalent investor under no compulsion to purchase stock; rather, what Benchmark did was to justify the purchase of stock by the ESOP at the price of $5.92 per share by limiting its analysis to comparing the actual offer to one made to hypothetical buyers "on the same terms and conditions as sold to the ESOP." (Benchmark Opinion Letter of December 23, 1986, at 2, Ex. 38A to the Secretary's Rule 3(g) Statement). These terms were, as Valley's valuation expert testified, comparing the ESOP purchase to that of a hypothetical buyer purchasing the stock "with no money down, no cash at risk, and on the basis of a non-recourse note dependent upon payments by the company." (Pratt Dep. of September 2, 1992, at 192–93, 197–99, Supp.App. T to Secretary's Motion for Partial Summary Judgment). The import of the "same terms and conditions" provision was to convert the Benchmark Report from an analysis of the fair market value of the shares into a determination of the stock's investment value to the ESOP.

Under this analysis the investment value to the ESOP of the stock was computed on the premise that the stock had a post-transaction value of $0.69 per share and a post-transaction contribution obligation from Kroy of $5.92 per share. Thus, the total "value" of the stock was $0.69 plus $5.92 for a total value of $6.61 per share. As Mark Lee noted, this methodology would justify any price to be paid by the ESOP as fair "[a]s long as there is a guarantee to pay and somebody is guaranteeing to pay the purchase price, and that guarantee is reasonable and can be made." (Lee Dep. of June 22, 1987, at 115–116, Supp.App. J to Secretary's Motion for Partial Summary Judgment).

Of course, as Valley knew from its review of the transaction prior to its decision not to participate in the financing of the Kroy LBO transaction, the guarantee by Kroy to pay did not, at the time the LBO was contemplated, appear to be reasonable. Valley's analysis of the transaction had concluded that there was a high probability that the guarantee could not be made. (Korsvik Memorandum, 1).

The Benchmark analysis therefore failed to measure the fair market value of the stock purchase. Indeed, the Benchmark Valuation Report did not claim that the price paid by the ESOP was fair market value. The Benchmark Report simply noted that the "6,000,000 shares of Class A common stock of the Surviving Corporation, if sold as a block of shares on the same terms and conditions as sold to the ESOP, would have a fair market value of at least $35.5 million" or $5.92 per share. (Benchmark Opinion Letter of December 23, 1986, at 2, Ex. 38A to the Secretary's Rule 3(g) Statement). But, this is not what "fair market value" really means.

Dr. Shannon Pratt, Valley's Valuation Expert, notes in his textbook *Valuing A Business* (2d ed. 1989), that the "definition of fair market value is almost universally accepted as the cash, or cash-equivalent, price at which property would change hands between a willing buyer and a willing seller, both being adequately informed of the relevant facts and neither being compelled to buy or sell." Pratt, *Valuing a Business* 22–23 (2d ed. 1989) (Ex. B to Secretary's Reply to Valley's Opposition to the Secretary's Motion for Partial Summary Judgment).

Even accepting, arguendo, Valley's argument that the price paid by the ESOP was reasonable in light of what the ESOP received, the purchase price did not amount to fair market value by definition. Investment value to the ESOP is not the same as fair market value, and it is the latter which is required by ERISA § 3(18). Fair market value is the value that a hypothetical non-obligated buyer would attach to an item, independent of the fact that the purchaser is an ESOP. (See Supp.App. E to Secretary's Motion for Partial Summary Judgment, Den Uyl Dep. of June 25, 1992, at 305–06). Even Dr. Pratt, Valley's Valuation Expert, conceded that no third-party cash purchaser would pay $5.92 per share for Kroy stock. (Supp.App. T to Secretary's Motion for Partial Summary Judgment, Pratt Dep. of Sept. 2, 1992, at 199; Pratt Dep. of Sept. 3, 1992, at 422).

Fair market value in the context of fiduciary breaches in ERISA cases has been defined as "the price that a willing buyer would pay a willing seller, both having reasonable knowledge of the pertinent facts." *Sommers Drug Stores v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1461 (5th Cir.1986) cert. den. 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987). It is hard to understand how Valley can claim fair market value was paid given the fact that the Kroy ESOP was not a willing buyer and that the $5.92 per share price had been explicitly analyzed by Benchmark only in terms of value to the ESOP, not to a willing buyer. Additionally, by withholding the Korsvik Memorandum from its advisors Valley clearly failed to provide that there was "reasonable knowledge of the pertinent facts."

Here, however, Valley did not refer in its analysis to what a hypothetical, non-coerced buyer would pay, but rather analyzed the investment in terms of the same conditions paid by the ESOP, whose very existence was conditioned on its purchase of the shares in question. The result was the investment value of the shares to the ESOP, not the fair market value, as Valley was required to pay under ERISA § 3(18)(B).

Valley argues that the $5.92 per share price is justified by the control premium obtained by the ESOP. Benchmark's Report supposedly valued control among the factors in the stock's valuation. The ESOP paid a premium which "reflected many benefits received by the ESOP in addition to control." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment at 58; Ex. 29 to Valley's Response to the Government's Rule 3(g) Statement, Pratt Dep. of Sept. 2, 1992 at 232–35).

Control is not an all or nothing matter. The ESOP purchased a measure of control, albeit not absolute control. (Id., Pratt Dep. of Sept. 2, 1992 at 232–35, 293–94, and Sept. 3, 1992 at 431). The Benchmark Report took into account the degrees of control obtained by the ESOP as well "as other benefits" [not listed anywhere]. "Different premiums for control will be paid by purchasers of the shares of stockholders holding varying degrees of control." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment at 62). According to Benchmark, the price of $5.92 per share included some dollars ascribed to the premium for control received. (Supp.App. J to Secretary's Motion for Partial Summary Judgment, Lee Dep. of June 22, 1987, at 69–70).

The control which the ESOP allegedly acquired was the ability of the ESOP to control the membership of the Kroy Board of Directors from the outset. At the time of closing, Kroy had a three member board selected initially by Errol Bartine, the sole shareholder of Kappa. Scott Spector had, however, negotiated for the ESOP a veto power over the initial composition of the Board. (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment at 62–63; Ex. 20 to Valley's Response to the Government's Rule 3(g) Statement, Spector Dep. of March 6, 1992, at 20; Ex. 19 to id., Gunderson Dep. of Feb. 3, 1992 at 268). There is no assertion that the ESOP ever exercised this power. It appears to be only illusory.

Other powers of the ESOP were: The right of an employee to sell his or her stock back to Kroy at "enterprise value" at the time of an employee's termination, retirement, or death. (Ex. 16 to Valley's Response to the Government's Rule 3(g) Statement, Lee Dep. of July 11, 1991 at 92–93; Ex. 31 to id., Benchmark Report at 41). This means that they could sell that stock back to Kroy as if "that stock was part of a purchase of a block of sixty percent (60%) of the total shares of Kroy, just as the ESOP had purchased them." (Valley's Memorandum in Opposition to the Secretary's Motion for Partial Summary Judgment at 64). Additionally, rights of first, second, and third refusal limited the market for the stock of other investors.

However, Valley's own Valuation Expert testified that he would not advise an ESOP to pay a control price for a put right without considering the terms under which the company would pay the repurchase obligation, the time of repayment, the company's short-term liquidity and long-term ability to finance its debt and the company's financial

history of repayment, i.e. the continued viability of that right. (Supp.App. T to Secretary's Motion for Partial Summary Judgment, Pratt Dep. of Sept. 2, 1992, at 209–11). It means little to be able to put one's stock back to the company if that company is no longer solvent, as was the case here. However, there is no evidence that Benchmark focused on any of these concerns when it concluded that the $5.92 price per share paid by the ESOP was justified.

In addition, even though Mark Lee admitted that a part of the price paid by the ESOP included some uncalculated amount of "dollars" for a control premium (Lee Dep. of June 22, 1987, at 69–79, Supp.App. J to Secretary's Motion for Partial Summary Judgment), Lee stated that the Benchmark valuation analysis omitted any quantification of this control premium. (Id. at 109–10).

Valley's justification of the price paid by the ESOP by reference to this "put right" is untenable. If the company was so shaky that the probability of the employee surviving the company's own termination was slight, this "most significant" of rights would amount to very little. It seems odd for Valley to claim that Benchmark ignored the Korsvik Memo because its significance was not important to the question of the value of the stock to the ESOP. The survivability of the company was of great importance if, as Valley claims, one of the reasons the stock was valued at so high a price to the ESOP, when other investors paid one-third the price, was that the ESOP participants had a "put" option to sell the shares back to the company when the employees' time with the company was at an end. It would seem that if the value of the stock is largely based on the survivability of the company, then one would want to look at one's own reports as to how likely that possibility is. Indeed, Valley's Valuation Expert testified that a control price for a put option would not be advisable without analysing the terms under which the company would pay the repurchase obligation, the time of repayment, the company's short- and long-term viability and ability to repay its debts and the company's history of repaying debt. (Pratt Dep. of September 2, 1992, at 209–11, Supp.App. T to Secretary's Motion for Partial Summary Judgment). There is no evidence that Benchmark relied on any of these factors in determining the fairness to the ESOP of the $5.92 per share price.

The Secretary's motion for partial summary judgment is granted. However, Valley contends that even if the Secretary's motion is granted, money damages are not recoverable because no loss was suffered by the ESOP. Therefore, in order to determine the remedy to be accorded the Secretary on his motion for summary judgment, the court must first take up the "no loss" argument asserted by Valley in its motion for partial summary judgment.

## II. VALLEY NATIONAL BANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Valley has moved for partial summary judgment, arguing that there was no loss sustained by the ESOP. Since the ESOP participants suffered no loss, Valley argues that it cannot be held answerable in damages. Valley maintains that but for the LBO, the ESOP would not have been created. Thus, Valley continues, except outside of its opportunity to invest in Kroy as part of the LBO transaction, the ESOP had no alternative investment opportunity. Therefore, by Valley's definition, there could be no loss as a matter of law. Any award against Valley is therefore limited to equitable relief.

Valley's argument proceeds in several steps. An analysis of these steps reveals that Valley's arguments have little merit, and that therefore Valley's motion for summary judgment should be denied. Valley's claims would be tenuous even were it not for the high standard it must shoulder as the party moving for summary judgment. On its face Valley's argument is bizarre. It would apparently immunize from money damages all trustees of ESOPs created by LBOs or ESOPs where the trustees' actions were contemporaneous or involved with the creation of the ESOP, regardless of the conduct of those trustees, and regardless of the consequences of that conduct.

As Valley notes, ERISA penalizes fiduciaries whose conduct results in loss. ERISA § 409, 29 U.S.C. § 1109, provides that

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any such losses to the plan resulting from the breach.

"In view of the intent expressed by Congress in providing for the recovery of 'losses,' and in the absence of evidence of Congressional intent to penalize, as such, violations of section 409, we hold that the measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned ... with what the Plan would have earned had the funds been available for other purposes." *Donovan v. Bierwirth*, 754 F.2d 1049, 1052, 1056 (2d Cir.1985).

Thus, Valley contends, there can be no losses as a matter of law since the *Bierwirth* calculus requires a contrast with what the plan would have earned had the funds been made available for other investments. In regard to the Kroy LBO transaction, since the funds would not have been available for other investments, Valley contends that there can be no losses by definition. The ESOP had no alternative investment opportunities. The ESOP only got a loan and assets for the purposes of participating in the LBO.

In 1986 "Kroy was a company in a turnaround situation which, faced with a vanishing market for its products and saddled with the debt of the leveraged buyout, was unable to achieve sustained profitability. Kroy only made contributions to the ESOP because the ESOP immediately returned the money to the corporation as payments on the ESOP's loan from Kroy. In the absence of these circumstances, Kroy would never have made any contributions to the ESOP." (Memorandum in Support of Valley's Motion for Partial Summary Judgment, 17).

The ESOP never had $17.5 million in assets prior to its investment in Kroy stock. As fiduciary, Valley argues it had only one choice: "to take the money and put it in the leveraged buyout, or reject both the leveraged buyout and the money. It had no right to take the money from Kroy and invest it in other places." (Valley's Reply in Support of Motion for Partial Summary Judgment, 11). The ESOP did not have any obligation to make payments on its promissory notes until Kroy made contributions to the ESOP. Thus, Valley argued, the ESOP obtained 6,000,000 shares of Class A common stock without any cash outlay or risk. (Ex. 1 to Valley's Rule 3(g) Statement).

Kroy's "loan" to the ESOP, Valley continues, was purely a function of tax laws. The ESOP was created solely to "significantly reduce the after tax cost of the leveraged buyout" pursuant to 26 U.S.C. § 133, which provides a tax break to the lending institution involved in a financing such as the Kroy LBO which was then passed on to Kroy in the form of lower interest rates, thus lowering the total cost of the LBO. (See Memorandum in Support of Valley's Motion for Partial Summary Judgment, 6). If it were not for these advantages to Kroy, the ESOP never would have been created.[4]

After the LBO, Kroy's precarious financial situation forced it to use all "available corporate revenues ... to meet expenses and service the debt from the leveraged buyout. Kroy made contributions to the ESOP because Kroy knew that the amounts it paid to the ESOP would be returned to it in the form of loan repayments." (Id., at 7; Ex. 1, 5, 6 to Valley's Rule 3(g) Statement).

Of course, the participants did earn the right to participate in the Plan by dint of their labors. In return, Valley argues, they were afforded the chance to receive a benefit based upon the company's market performance. This chance, like all investments, carried with it a certain risk potential.

---

4. Valley's arguments forget, however, that an ESOP's benefits to the employer are supposed to be secondary to its main purpose, which is to benefit the employees and give them a stake in the health of the company so as to induce greater labors on its behalf. The benefits that accrue to the company are inducements, mere secondary effects, not the primary purpose of ERISA and the tax-preferred status of ESOPs. It is this primary purpose that a fiduciary has a duty to protect, a duty abdicated in this case by Valley.

■ Upon proof of breach of fiduciary duty, Plan participants must be placed in the position they would have occupied but for the breach. *Bierwirth,* 754 F.2d at 1056; *Schoenholtz v. Doniger,* 657 F.Supp. 899, 903 (S.D.N.Y.1987). In this case, Valley maintains, but for the alleged breach there would have been no ESOP.

Valley is, of course, correct in its realization that ERISA provides for equitable relief. The Government or ESOP participants can, for example, enjoin transactions which threaten to violate ERISA. Also, employers and others who violate ERISA § 406 can be assessed excise taxes until the investment is unwound under I.R.C. § 4975(a), 26 U.S.C. § 4975(a).

The Government has available to it a variety of forms of equitable relief in addition to enjoining the transaction pre-closing. It can also prohibit the trustee from collecting fees for its services, remove the trustee, prohibit the trustee from serving as a fiduciary in the future, and award attorneys' fees against the trustee. See 29 U.S.C. §§ 1109, 1132; see also *Ironworkers Local No. 272 v. Bowen,* 695 F.2d 531, 535–36 (11th Cir.1983).

The Government points out how incorrect Valley's contentions are, both as a matter of law and as a matter of common sense. First of all, Valley's "no loss" argument is wrong as a matter of law.

ESOPs are employee benefit plans covered by Title I of ERISA. Once made, contributions to the ESOP become Plan assets and Valley's causing the investment of these assets in employer securities was subject to ERISA's fiduciary standards.

Under ERISA § 3(2), 29 U.S.C. § 1002(2), ESOPs must act in their own interest like any other prudent investor. (see e.g. ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1), ERISA § 404(a), 29 U.S.C. § 1104(a), ERISA § 406, 29 U.S.C. § 1106).

■ To qualify as an employee benefit plan under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and to qualify for preferred tax status under I.R.C. § 401(a), a plan must be created for the *exclusive benefit* of participating employees and also be structured to distribute benefits to participating employees at retirement. It is not proper to establish and administer an ESOP for the exclusive purpose of wringing tax benefits from the Government.

Once established, an employee benefit plan is legally an autonomous entity apart from the employer, See, e.g. ERISA §§ 3(14)(C), 29 U.S.C. § 1002(14)(C) (sponsoring employer is a party in interest); ERISA § 403(a), 29 U.S.C. § 1103(a), (plan assets must be held in trust); ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1), (employee benefit plan may sue or be sued as an autonomous entity).

■ The purpose of Title I of ERISA is to immunize an employee benefit plan from the employer's interest; *NLRB v. Amax Coal,* 453 U.S. 322, 333, 101 S.Ct. 2789, 2796, 69 L.Ed.2d 672 (1981). As noted, it requires conformity to extremely high standards, since the fiduciary standards of ERISA are the "highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir. 1982). The Kroy ESOP was an employee benefit plan under 29 U.S.C. § 1002(2). Since it was covered by ERISA, Title I, Valley as fiduciary must be held to the high fiduciary standards required by ERISA. Once in existence, the ESOP's assets were plan assets and Valley's decision to invest those assets in employer securities is subject to ERISA's high fiduciary standards. *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir. 1983).

■ Under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), Valley was required to invest Plan assets only in the interest of the ESOP participants and for the exclusive purpose of providing benefits "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

The Kroy ESOP's assets were part of the overall benefits and compensation package offered to employees who participated in the Plan. Employee benefits are not a mere gratuity, see *Inland Steel Co. v. NLRB,* 170 F.2d 247 (7th Cir.1948), cert. den. 336 U.S.

960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949), but a form of deferred wages. Clearly, if the ESOP's holdings in employer securities are worthless, the employees have lost certain of these deferred wages. These contributions from Kroy were deducted as ordinary and necessary business expenses pursuant to I.R.C. §§ 162 and 404(a). As such, they were reported on Kroy's corporate tax returns as reasonable compensation to the participants for services actually rendered.

Valley seems to forget that an ESOP is not merely a tool of corporate finance; it must act in its own interest like any other prudent investor; see e.g. 29 U.S.C. § 1103(c)(1); 29 U.S.C. § 1104(a); 29 U.S.C. § 1106. The Conference Report accompanying the enactment of ERISA recognized the danger posed by leveraged transactions involving ESOPs, and warned that "the interest rate should not be too high, and the purchase price of the stock from the party-in-interest should not be too high, so that plan assets might be drained off." H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1974) at 313, reprinted in 1974 U.S.Code Cong. & Admin.News, 4639, 5038, 5093. Valley's argument that no loss could have been occasioned by the LBO transaction goes counter to ERISA's fiduciary standards and raises the dangers warned of by Congress. Congress clearly believed that a leveraged ESOP investing in employer securities was investing plan assets that were subject to possible loss. Valley's position would lead, logically, to a conclusion that would eviscerate the congressional intent behind the protections enacted for the benefit of plan participants; the conclusion that an ESOP could participate in the leveraged buyout of the sponsoring entity and pay any price per share possible, without suffering any loss no matter how dear the price. This argument renders the "adequate consideration" protection of 29 U.S.C. § 1108(e) a nullity. Congress clearly felt otherwise. Indeed, so did Gunderson, and the rest of the ESOP bar, for why else would they perform a valuation of the stock if there was no possibility of loss?

The current value of the ESOP's portfolio reveals a loss has been suffered. "Certainly any valuation of the Plan's assets would reflect a diminution in the value of those assets resulting from the fact that the companies in which the Plan invested are bankrupt. More importantly, the participants in the Plan have directly suffered the loss of being unable to collect their benefits promised by the terms of the Plan...." *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 642 (W.D.Wisc.1979).

As the Government notes, Kroy's loan to the ESOP was a transaction entirely separate and apart from the ESOP's decision to acquire employer securities at $5.92 per share. Title 29 U.S.C. § 1106(a)(1)(B) generally prohibits loans made between a plan and a "party in interest", including the sponsoring employer. See 29 U.S.C. § 1002(14)(C). However, 29 U.S.C. § 1108(b)(3) contains an exemption which allows the financing of qualifying employer securities by the ESOP with a loan guaranteed or made by the party in interest. To qualify for this exemption (1) the loan must be primarily for the benefit of the plan's participants and beneficiaries; (2) the interest charged must not be in excess of a reasonable rate; and (3) if the ESOP pledges collateral for the loan, this collateral may consist only of qualifying employer securities.

The ESOP had assets and Valley's decision to invest them was subject to ERISA's fiduciary standards, regardless of the fact that the ESOP was committed to this investment under the Plan documents before its receipt of any contributions from Kroy. See *Eaves v. Penn,* 587 F.2d 453, 459 (10th Cir.1978). Thus, since there were two transactions, the loss claimed by the Secretary may be charged to either one of them. The employees have suffered a loss: roughly $17.5 million dollars in loans or in the stock transaction.

For the purposes of the instant motion, it is unnecessary to decide whether or not there were one, or two, or numerous transactions involved in the LBO and the creation of the ESOP and the investment of the ESOP's funds obtained by loan in the shares of Kroy.

Valley's analysis obscures the fact that while an employer is under no obligation to establish an ESOP, once it does so ERISA's standards apply. An employer cannot condi-

tion Plan contributions on a violation of ERISA, since ERISA § 410(a), 29 U.S.C. § 1110(a), forbids any agreement "which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part [as] void as against public policy."

Thus, Valley's motion for partial summary judgment on the "no loss" ground will be denied, since as the Kroy contributions became Plan assets once made, Valley's decision to invest those assets was subject to ERISA's fiduciary standards. Clearly, a loss has been suffered. The next question that must be addressed is the extent of the loss for which Valley is responsible.

The Measure of the Loss

█ *Donovan v. Bierwirth,* 754 F.2d at 1055, held that while ERISA preempts state law, it is clear that Congress' intent to provide the courts with broad remedial powers contemplated that courts look to principles developed under the common law of trusts which, in large measure, remain applicable under ERISA. One such remedy is that the fiduciary repay the purchase price, plus interest, here $17.5 million plus interest. Another case, *Beck v. Levering,* 947 F.2d 639 (2d Cir.1991) reaffirmed the principle of broad judicial remedial power.

The sections of ERISA pertaining to fiduciary responsibility were intended "to make applicable the law of trusts; to prohibit exculpatory clauses ...; to establish uniform fiduciary standards to prevent transactions which dissipate or endanger plan assets; and to provide effective remedies for breaches of trust." Statement of Senator Williams, Aug. 22, 1974, 120 Cong.Rec. S15737, reprinted in 1974 U.S.Code Cong & Admin.News 5177, 5186. As the Secretary notes at page 3 of his Surreply in Opposition to the Motions for Partial Summary Judgment Submitted By Valley National Bank, ERISA was enacted to "provide the full range of legal and equitable remedies available in both state and federal courts." H.R.Rep. No 533, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 4655.

Legal remedies are vital to ERISA's enforcement scheme, and this court cannot eviscerate that scheme merely because Valley was swift enough to consummate the LBO transaction before the Government brought a pre-closing enforcement action. As the Secretary points out, the available equitable remedies are insufficient to prevent the sort of wrongdoing with which Valley is charged here. According to Valley's argument, any employer can terminate its ESOP at will, which it has the legal right to do, and then reconstitute it with a forbidden transaction that primarily benefits the company. As long as the Secretary is not quick enough to enjoin the transaction pre-closing, the Secretary is then precluded from obtaining money damages no matter how high the losses suffered by the employees.

The equitable remedies outlined by Valley would never be sufficient or even available in a case like this one in which all the LBO participants are no longer involved. See 29 U.S.C. §§ 1109, 1132. *Ironworkers Local v. Bowen,* 695 F.2d 531, 535–36 (11th Cir.1983). Also, while there are tax penalties available against a company under IRC § 4975, none of these remedies avail the employees. There is no sufficient equitable remedy for the employees when ERISA-violating actions such as are the subject of this action are consummated quickly. Equitable remedies alone provide the Government with a very limited window of enforcement, limiting it largely to pre-transaction relief.

The *Bierwirth* issue was whether an ESOP suffered a loss under ERISA § 409(a), 29 U.S.C. § 1109(a), when securities purchased in a breach of trust were later sold at a higher price than that obtained during the original purchase. The court found that even though the Plan made a "profit" there still could be a "loss" if the Plan would have made a greater profit had the funds invested been available for other Plan investments. *Bierwirth* at 1506. See also *Dardaganis v. Grace Capital, Inc.,* 889 F.2d 1237, 1243–44 (2d Cir.1989).

Following this analysis, the ESOP lost roughly $17.5 million plus interest, minus the $250,000 already recovered. The Kroy ESOP's original investment of $17.5 million

was worth nothing at the time of the collapse of Kroy.[5]

This measure of loss is consistent with the common law of trusts from which ERISA's fiduciary standards are derived. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110–13, 109 S.Ct. 948, 954–56, 103 L.Ed.2d 80 (1989); *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* 472 U.S. 559, 570, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985).

 Under the common law of trusts, a trustee who purchases property in a breach of trust is liable for the purchase price plus interest if the breach constitutes some misfeasance other than simply paying too high a price for the property. *Estate of Rothko,* 43 N.Y.2d 305, 401 N.Y.S.2d 449, 372 N.E.2d 291, 297–98 (1977).

Thus, even if Valley's breach involved nothing more than paying too high a price for the stock, Valley would still be liable for the difference between the price paid and the price that should have been paid. See *Estate of Rothko,* 401 N.Y.S.2d at 455, 372 N.E.2d at 297.[6]

In any event, the Secretary argues that ERISA contemplates per se violations. Thus there can be monetary penalties absent proof of actual loss. He relies on the decision in *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 643 (W.D.Wisc.1979) where the court found that ERISA § 409 provides for both profit and loss restoration. The court there held that it had broad discretion to fashion relief, and where the Plan invested in companies that subsequently went bankrupt, the Plan lost the amount in money reflecting the diminution of the value of its assets. Whether the violations are per se need not

be passed on. The determination that there was a loss is a sufficient basis for denying Valley's motion for partial summary judgment.

## III. VALLEY'S COUNTERCLAIMS AND THE MOTIONS FOR SUMMARY JUDGMENT THEREON BY BOTH PARTIES

Valley has interposed several counterclaims and affirmative defenses. Valley has moved, and the Department has counter-moved, for summary judgment on the counterclaims. The counterclaims and the affirmative defenses arise for the most part out of the same nucleus of operative fact and appear to be facets of the same general argument. A discussion of one claim necessarily involves a discussion of a good deal of the same legal and factual issues. At the heart of Valley's various counterclaims and affirmative defenses is the contention that although the DOL did not formally review the LBO transaction prior to closing, there was an informal review during which the Department implicitly approved the transaction. Additionally, Valley contends that the Department violated some legal duty owed it by not promulgating certain regulations further defining "adequate consideration."

In 1974 Congress instructed the Secretary of Labor (the "Secretary") to promulgate regulations defining "adequate consideration" to guide trustees like Valley and other parties in structuring ESOP-financed leveraged buyouts ("LBOs"). Instead of promulgating the necessary regulations, the Department implemented an informal pre-closing review procedure. Under that procedure, the Department reviewed the terms of ESOP-financed LBOs

---

5. Kroy's public shareholders received, as a result of the LBO, $69.6 million in cash for all of the company's outstanding shares. Of this amount $35.5 million came from the ESOP, which then took out that amount in debt. Thus the ESOP did in reality put in something for the stock, a heavy dose of debt. While this debt was in the form of non-recourse notes, the participants in the ESOP, the employees of Kroy, essentially deferred wages in order to be Plan participants. These deferred wages were lost when Kroy collapsed, amounting to a significant loss suffered by the ESOP participants.

6. Valley asserts that the remedies provided for in § 409 preempt the common law of trusts. ERISA § 514 provides that "the provisions of [ERISA] shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." As case law clearly and unequivocably states, this contention is absurd. The principle that ERISA's remedies are to be derived from the common law of trusts is so well established that for Valley to contend otherwise is beyond the pale of what is acceptable as argument before a court.

prior to consummation, and alerted the ESOP trustees and other parties to the Department's legal concerns or problems. In 1986, the Department thoroughly reviewed the buyout at issue here and advised the parties that it had no objection to the closing of the transaction."

(Memorandum in Support of Valley's Motion for Summary Judgment, at 2). A close analysis of Valley's claims stemming from the above statement reveals them to be totally devoid of merit.

Also central to Valley's counterclaims and affirmative defenses is the charge by the Department that the Kroy LBO transaction violated ERISA because of the equity allocation between the ESOP and the other investors in the LBO. In particular, the Secretary charges that not only did Valley violate ERISA by not conducting an independent prudence review of the transaction, thus causing the ESOP to invest without receiving adequate consideration, but also that Valley violated ERISA by not obtaining for the ESOP a dollar's worth of equity for each dollar it invested; that is, the Department claims that ERISA §§ 3(18)(B) and 408(e) mandate a dollar-for-dollar equity allocation. Each dollar invested by the ESOP should purchase the same amount of equity (stock) in the company as that obtained by each dollar invested by other parties to the transaction.[7] This dollar-for-dollar rule is the Secretary's interpretation of the applicable ERISA sections. Valley not only challenges this interpretation, it also challenges the Secretary's right to even advance that interpretation in this litigation. Again, a close analysis reveals this challenge as devoid of any legal or factual support.

### A. Violations of Due Process

#### 1. Failure to Promulgate Regulations (Second Counterclaim)

Valley argues, quite unpersuasively, that the Department's "failure" to promulgate regulations deprived it of property without due process of law. "Because the regulations were not promulgated, there are no rational and objective standards by which to measure Valley's conduct with respect to the transaction." (Valley's Counterclaim, ¶ 45).

Valley bases its argument largely on ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(B), which reads in relevant part as follows:

"The term "adequate consideration" when used in part 4 of subtitle B of this subchapter means ... (B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary."

It is this last phrase, "in accordance with regulations promulgated by the Secretary" upon which Valley hangs its legal hat. "The Secretary is required to promulgate such regulations, it is not within her discretion to decide whether to do so." (Memorandum in Support of Valley's Opposition to Government's Motion to Strike, 5–8).[8]

In support of this contention Valley cites in main part *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), *Hammond v. Lenfest,* 398 F.2d 705, 715 (2d Cir.1968) and *Hupart v. Board of Higher Ed. of N.Y.,* 420 F.Supp. 1087, 1107 (S.D.N.Y.1976). However, as is clear from an analysis of these and other relevant cases, there is no convincing legal evidence in support of Valley's Due Process arguments.

*Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957), involved the loyalty review of a Foreign Service Officer discharged during the period when the government investigated the question of "who lost China." John Service was discharged by the Loyalty Review Board of the Civil Service Commission as a security risk. The Court unanimously held the discharge to be

---

**7.** In order to determine whether or not the adequate consideration requirement was met, it is not necessary to determine whether ERISA mandates a dollar-for-dollar equity allocation rule. An analysis of the facts of this case indicate that the adequate consideration requirement was not fulfilled even without imposition of the dollar-for-dollar rule.

**8.** The Secretary contends with some force that this court lacks jurisdiction on this counterclaim.

invalid on the grounds that the discharge violated published and established regulations pertaining to State Department employees. Absolutely nothing in the decision, which involved the Government's duties to its own employees when the relevant agency has *already* published regulations, relates to the issue in the case at bar. Rather, the instant issue is whether or not the DOL under the aegis of its enforcement obligations over the private sector was obligated to promulgate regulations pertaining to the definition of "adequate consideration."

*Hammond,* a Vietnam-era habeas review of a conscientious objector's denial of discharge is also inapposite. *Hammond* was similar to *Service* in scope. *Hammond* merely held that when a selective service classification is made by the military, it can be reviewed on habeas to determine whether or not the Government agency responsible acted in accordance with regulations *previously* promulgated and published, even where the action taken is essentially discretionary in nature (i.e. the military can either find that a petitioner merits conscientious objector status or not). *Hammond,* 398 F.2d at 715. This case stands for the proposition that once a Government agency promulgates and publishes a regulation, this "validly promulgated regulation binds the government as much as individuals subject to the regulation." Id. The Court ruled that petitioner Hammond was entitled to habeas review since he was in military custody but limited the scope of review to allow a reversal of the military decision only if it was determined to have been taken without any basis in fact. 398 F.2d at 716–717. This is quite irrelevant to the question addressed by Valley, which is under what circumstances an agency can be legally obligated to promulgate regulations. Valley has the same rights as the petitioner in *Hammond.* The Government cannot sanction Valley for not hiring enough left-handed Lithuanians, for example, since that power is not given to the Secretary in the relevant regulations. On the other hand, since the question of "adequate consideration" is part of its statutory enforcement regime, the DOL has the authority to enforce that requirement on private parties that come within its purview.

After the decision in *Hammond,* the military voluntarily and independent of any judicial imperative adopted new regulations, pursuant to its discretionary power to issue further regulations on the issue of conscientious objection to military service and the discharge of conscientious objectors. The Court therefore remanded the case back to the Navy's jurisdiction in light of the new regulations. The Court did not in any way direct the promulgation of these new regulations.

The case of *Hupart* is similarly unavailing for Valley. That case is legally irrelevant, as that case also hinged upon the requirement that an agency follow its own previously promulgated and published rules, 420 F.Supp. at 1107, not upon any mandate to promulgate such rules.

Valley has adduced nothing in support of its contention that it had a protected property interest and that the Secretary had an enforceable duty to promulgate regulations defining adequate consideration. All Valley has is a unilateral desire that certain regulations be enacted, but a unilateral expectation does not give rise to a protected property interest. "To have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . . Property interests . . . are created and their dimensions are defined by *existing* rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972) (holding that teacher's interest in renewed employment was not a property interest because, inter alia, there was no "state statute or University rule or policy that secured his interest," 408 U.S. at 578, 92 S.Ct. at 2710, 33 L.Ed.2d at 561) (emphasis supplied).

█ Where law makes official action discretionary, (here the promulgation of rules defining "adequate consideration"), there is no Due Process property interest in a favor-

able decision. *RR Village Assoc., Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1201–02 (2d Cir.1987), *Dun & Bradstreet v. U.S.P.S.*, 1991 WL 8417 (S.D.N.Y. Jan. 22, 1991).

The Government has no duty to promulgate an "adequate consideration" regulation. Title 29 U.S.C. § 1002(18)(B) defines adequate consideration as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary." It in no way requires the promulgation of further regulations. A comparison of this section with other ERISA sections which do require regulation promulgation further illustrates the correctness of the Secretary's contention. Title 29 U.S.C. § 1002(31) (Supp.1992), ERISA 3(31), regarding the term "advance funding actuarial cost method" states in the last sentence of the section that "[t]he Secretary of the Treasury shall issue regulations to further define acceptable actuarial cost methods." No such language is found in 29 U.S.C. § 1002(18)(B). Also, 29 U.S.C. § 1108(a) (Supp.1992), ERISA § 408(a), states that "[t]he Secretary shall establish an exemption procedure for purposes of this subsection." In contrast, there is no "shall" language in the statutory sections relevant to this action. Where a government actor has the discretionary authority to act, the unilateral expectation or desire for a decision in one's favor, e.g. the promulgation of a sought-for regulation, does not rise to the level of a protected property interest. Where mandatory "shall" language is lacking no action will lie against the government actor for failure to act. *Dean Tarry Corp. v. Friedlander*, 826 F.2d 210, 213 n. 3 (2d Cir. 1987).

Title 29 U.S.C. § 1135, ERISA § 505, which delegates authority to the Department of Labor to promulgate regulations relating to technical terms, provides that "the Secretary may prescribe such regulations *as he finds necessary* and appropriate to carry out the provisions of this title. Among other things, such regulations *may* define accounting, technical and trade terms used in such provisions." (emphasis supplied). Clearly, this permissive language in no way mandates that the Secretary must promulgate such

regulations, no matter how helpful they may be. The underscored terms indicate quite clearly that the Secretary's decision to issue regulations defining terms like "adequate consideration" is completely discretionary.

Valley repeatedly cites the admonishments of the Fifth Circuit in *Donovan v. Cunningham*, 716 F.2d 1455, 1466 (5th Cir.1983), as "proof" that the Secretary was required to promulgate such regulations.[9] This court is bound not by the desires of judges on other circuits but instead by the clear language of Congress. What Congress clearly states necessitates this court's conclusion that the Secretary was not required to promulgate any such regulations. In any event, even given its criticism of the Secretary for failing to exercise his discretionary rule-making power, the Fifth Circuit still held the adequate consideration requirement valid and binding and found that an ESOP fiduciary is bound by the requirement "to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." 716 F.2d 1455, 1467–68 (footnotes omitted). It also held that the burden of proof was on the fiduciary to affirmatively demonstrate that adequate consideration was paid.

A recent case decided by the District of Columbia Circuit is instructive on this point. In *A.A.R.P. v. E.E.O.C.*, 823 F.2d 600 (D.C.Cir.1987), petitioners were seeking to compel the Equal Employment Opportunity Commission to publish regulations pursuant to Section 9 of the Age Discrimination in Employment Act, 29 U.S.C. § 628 (1982). The court examined that statute which had language similar to that found in ERISA § 505, 29 U.S.C. § 1135, and found that the language therein did not compel such action. In relevant part, Section 9 stated that the Commission "may issue such rules and regulations as it may consider necessary or appropriate for carrying out this chapter, and may establish such reasonable exemptions to and from any or all provisions of this chapter as it may find necessary and proper in the

9. Valley throughout its briefs invokes this case as if it had talismanic effect.

public interest." 823 F.2d 600, 604. The court noted that "[i]t would be difficult to find more permissive statutory language." Id. The same reasoning and statutory analysis governs here.

Valley cannot credibly contend that it had no fair warning of the statute's reach. Title 29 U.S.C. § 1002(18)(B) is not so vague and ambiguous as to be a violation of the Due Process clause. There are rational and objective standards, that of "adequate consideration", against which Valley could measure its performance as fiduciary. *Cunningham,* 716 F.2d 1455, 1467–68. Valley even had knowledge of the dollar-for-dollar position of the Secretary due to the widely circulated Department letter concerning the Scott & Fetzer transaction, 12 Pens.Rep. (BNA) 1182 (August 26, 1985) (Appendix S to Secretary's Response to Valley's Rule 3(g) Statement).

There is no statute and nothing in § 1002(18)(B) that requires the Department to promulgate regulations further defining "adequate consideration." There is no mandatory language, no "shall" language, in any relevant statutory section. Other sections have such mandatory language, e.g. 29 U.S.C. § 1108(a). ERISA § 505, 29 U.S.C. § 1135, leaves technical definitions to the Secretary's discretion.

Regulations can define the scope of a property interest, but no one can have a property interest in the regulation itself. Valley has no property interest in anything other than what it may ultimately lose in this lawsuit, and on that score this court is already giving Valley whatever process it may be due.

2. Failure to adhere to informal review (Third Counterclaim)

 Valley bases its third counterclaim cause of action on its unsupported contention that the Government abrogated a prior informal review finding which allegedly approved the transaction. Valley asserts that

> [i]nstead of satisfying the duty imposed by ERISA section 3(18)(B) by issuing rules on which the public could rely respecting "ad-

equate consideration" issues in leveraged buyouts, the Secretary developed a practice of investigating ESOP participation in leveraged buyout transactions *prior* to their closing. Valley's Counterclaim at ¶ 17. As to those transactions reviewed, and in instances in which the Secretary believed that the transaction would not be for "adequate consideration," or that a trustee would otherwise not satisfy his fiduciary duties with respect to the transaction, the Secretary would inform the trustee or the trustee's legal representative, either orally or in writing, of the Secretary's concerns. *Id.* As to these transactions, the Secretary made a conscious policy choice to apply the Labor Department's enforcement scrutiny at the pre-closing stage, rather than after the closing. *Id.*

(Memorandum in Support of Valley's Opposition to the Government's Motion to Strike, 8–9).[10]

The question, then, is whether a government agency is bound, (to the same extent that it is bound when it acts pursuant to published rules and regulations) when it reviews certain documents pertaining to the planned action of a private party, where there is no official process for such review (even assuming it exists), when that agency does not inform the private party that its planned action will be subject to an enforcement action. The cases cited by Valley, such as *International House v. N.L.R.B.,* 676 F.2d 906, 912 (2d Cir.1982), are clearly irrelevant, as those cases deal with agency action pursuant to duly promulgated and published regulations.

Valley argues that it had a right to rely on the informal approval process which it alleges exists and was common practice. Valley additionally contends that the Government concealed from Kroy participants an ongoing investigation of the Kroy LBO which began in the months just prior to the close of the LBO transaction. This process was alleged to be part of the Department's "standard operating procedure." (Valley's Consolidat-

---

10. While Valley adduces no evidence of its contention that such an alternative review procedure actually existed, they maintain that the mere pleading of the existence of such a procedure is sufficient to escape summary judgment. (See Memorandum in Support of Valley's Opposition to the Government's Motion to Strike at 45).

ed Brief in Support of its Motion for Summary Judgment and in Response to the Government's Cross–Motion for Summary Judgment, 57). The facts of the case demonstrate that Valley's contentions are devoid of merit.

The evidence clearly demonstrates that no such informal review process existed to address the question of "adequate consideration." Valley is correct in noting that the DOL had notified certain LBO participants in other ESOP-financed transactions of their concerns, sending out letters to the parties involved expressing certain concerns of the DOL.[11] One of those transactions involved Raymond International, where the DOL sent a letter to Gareth Cook of Vinson & Elkins outlining their concern that the ESOP fiduciary was not making decisions with the serious and careful consideration required by law. "In this letter we summarize our concerns and suggest certain steps by which our concerns may be addressed." (Labor Department Opinion Letter of September 12, 1983, 11 Pens.Rep. (BNA) 1494 (November 19, 1984), Appendix J to Valley's Notice of Motion of October 5, 1990).[12]

In regard to another transaction a letter was sent to the ESOP counsel for Blue Bell Inc., in which the Department, through Norman Goldberg, Counsel for Fiduciary Litigation of the Plan Benefits Security Division, issued an opinion letter to Charles Smith of Kirkpatrick & Lockhart stating that "the Department contemplates no enforcement action under ERISA challenging the Plan's participation in the leveraged buyout of Blue Bell, Inc." (Labor Department Letter Closing Case of November 26, 1984, 12 Pens.Rep. (BNA) 52 (January 7, 1985), Appendix K to Valley's Notice of Motion of October 5, 1990). This letter was sent because Smith had represented to the Department that a face-to-face meeting to address the concerns of the Department could not be scheduled. (12 Pens.Rep. at 52). In that letter the Plan Benefits Security Division asked the ESOP counsel to "advis[e] us as soon as possible what steps, if any, the Committee intends to take to address the issues we have identified." (12 Pens.Rep. at 54).

An objection was also issued by the Department in the case of the Scott & Fetzer ESOP-financed leveraged buyout, in which the Department of Labor, through Charles Lerner, Assistant Administrator of Enforcement, notified Wilson Ellis, Vice–President of The Citizens and Southern National Bank of Atlanta, Georgia, which served as ESOP trustee, that "based on our initial review of the proposed transaction, we have preliminarily concluded that the Trustee would breach its fiduciary duties under ERISA if it causes the ESOP to participate in the buyout on the terms that are currently under consideration." Labor Department Letter on Proposed Leveraged Buy–Out of July 30, 1985, 12 Pens.Rep. (BNA) 1182 (August 26, 1985), attached as Appendix M to Valley's Notice of Motion). The Department further told Ellis that in light of its concerns, it was "continuing [its] review and analysis of the proposed transaction, but wishe[ed] to make you aware of our concerns prior to its consummation." 12 Pens.Rep. at 1183. The Scott & Fetzer transaction was eventually scuttled as the parties were unable to agree on the modifications to the LBO that the DOL desired.

Valley argues that the appropriateness of referring documents to Virginia Bartlett was confirmed in telephone conversations between Bartlett and Kaplan and Patterson attorneys. It is unclear what legal import Valley attaches to the term "appropriate." However, Green testified that the reason why he sent documents concerning the Kroy LBO transaction was that Simone directed him to do so. (Green Dep. of March 27, 1992, at 56, attached as Ex. G to Valley's

---

11. These letters are a matter of public record since they are published and are easily accessible from a variety of electronic database services or lawbooks.

12. This letter is also interesting for its delineation of the fiduciary duty of the ESOP trustee: "While the buy-out is conditioned upon a valuation consulting firm issuing an opinion on the fairness of the transactions in question, and upon the issuance of legal opinions regarding ERISA, and while the fiduciaries may consider such opinions in reaching their decisions, the ultimate responsibility for their decisions—as well as liability for losses caused by those decisions if the fiduciaries fail to observe the statutory standards—rests on them alone."

Response to the Secretary's Rule 3(g) Statement in Support of Her Cross–Motion for Summary Judgment). Valley has provided no reference to any statutory or regulatory framework which would support their contention that such a procedure existed, nor has it presented any documentary evidence originating from the Department to confirm this impression. There is absolutely no document in the record from the Department which constitutes a request for the submission of documents.

Valley insists that the informal review procedure was developed by the Department of Labor as a mechanism "through which practitioners could receive guidance as to the Department of Labor's view on a specific ESOP investment in a leveraged buyout." (Valley's Consolidated Reply in Support of Its Motion for Summary Judgment and Response to the Government's Cross–Motion for Summary Judgment, 4). However, the deposition testimony cited by Valley does not support this contention, but only indicates that indeed Patterson had a practice of sending documents concerning pending transactions to the Department. (See e.g. Simone Dep. of March 26, 1992, at 208, Ex. C to Valley's Response to the Secretary's Rule 3(g) Statement in Support of Her Cross–Motion for Summary Judgment; Ex. B, Spector Dep. of January 23, 1991, at 138–39, attached as Ex. B to id.; Brecher Dep. of March 31, 1992, at 60, 62, 98, attached as Ex. D. to id.).

Valley further claims that it was "common knowledge" in the ERISA community this was the only way ERISA practitioners could get guidance as to "adequate consideration." Yet the deposition testimony referred to by Valley in support of this contention clearly indicates that it was also understood that any informal contact would not preclude a post-closing enforcement action. (See the following attached exhibits to id.: Simone Dep. of January 16, 1991, at 144–45 (attesting that the Department did not issue formal opinions on the question of "adequate consideration") (Ex. C); Spector Dep. of Jan. 24, 1991, at 97–99 (Spector stated that he believed that if the Department did not object to a closing it would not, as an empirical matter, be likely

to take any post-closing enforcement action; however, in response to the question: "Did you believe ... that if the Department did not bring an action to enjoin the transaction before it closed, that it would subsequently be barred from bringing an action after the transaction closed?" he answered "No." (Ex. B); Green Dep. of March 27, 1992 at 46–52, 72–73, 139–140 (Ex. G); Kroll Dep. of March 31, 1992, 21–22, 25–26, (Ex. E); Sweetnam Dep. of March 12, 1992, 51–52 (Ex. E)).

ERISA practitioners were not discouraged from using informal review, according to Valley. The evidence in support of this argument, however, indicates merely that the Department did not affirmatively prevent parties from mailing documents concerning proposed transactions to Department offices. There is no evidence or legal support for the proposition that failure to "discourage" these submissions amounted to de facto approval of the transactions in question. (See the following attached exhibits to id.: Spector Dep. of January 24, 1991 at 97–98 (Ex. B); Simone Dep. of January 16, 1991 at 140–45 (Ex. C); Brecher Dep. of March 31, 1992, at 55–56, 61–62, 68–69, 108–110 (Ex.D); Green Dep. of March 27, 1992 at 82–85, 46–50 (Ex. G); Sweetnam Dep. of March 12, 1992, 43–44 (Ex H)).

Valley thus claims that it had a reasonable expectation that the Government would act consistently with its indication through the alternative approval procedure that the Kroy transaction satisfied the definition of "adequate consideration." (Memorandum in Support of Valley's Opposition to the Government's Motion to Strike, 35). Valley contends that ERISA § 3(18)(B), 29 U.S.C. § 1002(18)(B) obligated the government to provide this guidance. (Id. at 40). Thus, Valley claims, it was deprived of a property interest, this interest being the expectation of "having a consistent legal rule applied." (Id. at 35). By representing through Bartlett that "no objection" was had by the Department to the Kroy transaction, the Department affirmatively misled Valley. (Id. at 40–41).

The Government is correct in questioning the reasonableness of this expectation. The ERISA section cited, ERISA 3(18)(B), 29

U.S.C. § 1002(18)(B), does not obligate the Government to provide this guidance. Since the DOL did not conduct reviews prior to transactions occurring (See Simone Dep. of January 16, 1991, at 102, 137–38; Simone Dep. of March 26, 1992, at 210, 352–54), there is no procedure that would give rise to a due process-protected property interest.

ERISA Procedure 76–1 (Proc. 76–1), printed at 41 Fed.Reg. 36281 (Aug. 27, 1976), entitled Advisory Opinion Procedure, sets forth the procedures to be followed to obtain the Department's opinion regarding a prospective transaction. "An 'advisory opinion' is a written statement issued to an individual or organization, or to the authorized representative of such individual or organization, by the Administrator of Pension and Welfare Benefit Programs or his delegate, that interprets and applies the Act to a specific factual situation. Advisory opinions are issued only by the Administrator of Pension and Welfare Benefit Programs or his delegate." ERISA Proc. 76–1, § 3.02. Section 6 sets forth a number of requirements for applicants. Section 10 states that an advisory opinion may be relied upon only by the parties described in the request for the opinion and that "they may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and the situation conforms to the situation described in the request for opinion."

There is no evidence whatsoever that such an opinion was either sought by or issued to Valley. The record is devoid of any evidence whatsoever that Valley submitted a request for an advisory opinion pursuant to the requirements laid out in ERISA Proc. 76–1 § 6, especially § 6.02(a) and (b). It is not surprising that there was no such request since it is clearly stated in ERISA Proc. 76–1 § 3.02(a) that the Department does not issue advisory opinions relating to ERISA "Section 3(18)(B), relating to whether certain consideration constitutes "adequate consideration."

The cases of Raymond, Scott & Fetzer and Blue Bell are clearly distinct, as those involved *official* letters from the DOL to the parties involved clearly spelling out the DOL's opinion to the parties, as opposed to unofficial letters from the parties to the DOL.

Even assuming that there was an affirmative misrepresentation by Department employees to Valley, an assertion for which there is absolutely no evidence,[13] Valley could not prevail on this counterclaim. The Government is not bound by the unauthorized representations of its agents. *Goldberg v. Weinberger*, 546 F.2d 477, 480–81 (2d Cir. 1976), cert. den., 431 U.S. 937, 97 S.Ct. 2648, 53 L.Ed.2d 255 (1977). Regardless of the nature of Bartlett's comments to Valley, since the statutory scheme did not authorize her to grant approval to a transaction such as the Kroy LBO, Valley cannot rely on any of her statements, even assuming their existence. "The Government could scarcely function if it were bound by its employees unauthorized representations." Id. at 481.

The Secretary does not deny that it did, on occasion, review prior to closing certain transactions and issue letters to the participants expressing concerns. The mere fact that the agency stopped other transactions pre-closings does not obligate it to limit its objections to the pre-closing stage of a transaction. What the Secretary does dispute is Valley's claim that these occurrences, either alone or in combination, amounted to an "informal review procedure" upon which Valley or anyone else had any right to rely. The fact is that these occurrences add up to nothing more than the usual exercise of the Secretary's enforcement discretion.

The mere fact that the DOL's Office of Enforcement of the Pension and Welfare Benefits Administration decided to object pre-closing to other ESOP-financed LBO's, such as that of Raymond International, Blue Bell, Scott & Fetzer, is nothing more than

---

**13.** Valley's assertions that it was told that the Department approved the transaction are absurd and incredible. There is not one shred of evidence to support this claim. Valley would have this court believe that the Department approved a multi-million dollar transaction and issued no letters, opinion, or paper whatsoever. It is beyond belief that any rational actor (let alone any competent or even half-witted attorney) would cause $35.5 million to be invested without even *asking* for documentary proof that there had in fact been governmental approval.

the exercise of the Secretary's enforcement discretion. Valley had no Due Process right to expect similar treatment. See, e.g. *RRI Realty Corp. v. Southampton*, 870 F.2d 911, 914–920 (2d Cir.), cert. den. 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989).

In fact, Patterson, itself, knew that there was no binding pre-closing informal review. On July 7, 1987, there was a conference between Patterson attorneys Stuart Alperin, Joseph Coco, Michael Segal, Arthur Kroll, Joseph Simone, and Max Schwartz, and DOL representatives Alan Lebowitz, Sherwin Kaplan, and Alan Levitas, concerning a transaction involving the Hospital Corporation of America. This conference was memorialized in a memorandum attached as Appendix P to the Secretary's Response to Valley's Rule 3(g) Statement. In this conference the "Department stated that it had an open mail box policy with regard to unsolicited submissions and that sometimes the Department looks at the information submitted and sometimes it doesn't.... The Department stated that any current lack of action on its behalf would not preclude action after the transaction was completed." The memorandum further stated that "Counsel then referred to a speech given by a Departmental representative which stated that the Department's receipt of a submission prior to the consummation of the transaction would not preclude its audit of such transaction after its completion." (Id. at 1–2).

Simone of Patterson had previously utilized the advisory opinion process laid out in ERISA Proc. 76–1 in other transactions and had specifically asked for a written advisory opinion. His prior behavior demonstrates that he knew that the correct procedure was to use such procedures so that any result would be memorialized in writing and made a matter of public record. See, e.g. Opinion 85–07A, February 22, 1985 (available on WESTLAW FPEN–ERISA database) (available in LEXIS at 1985 ERISA LEXIS 38). In addition, Thomas Hoecker of Snell & Wilmer, Valley's Arizona counsel, had participated in the advisory opinion process on behalf of Valley's own ESOP. An opinion had been requested by letter dated January 10, 1986, eleven months before the Kroy transaction

closed, and an opinion issued by the Labor Department on April 5, 1988, Opinion 88–08A, April 5, 1988 (available on WESTLAW FPEN–ERISA database) (available on LEXIS at 1988 ERISA LEXIS 8).

Even discounting for the moment the actual legal import of any such submissions to the Department, Valley cannot rely on the argument of "informal review" because it was not Valley which had the contact with the Department. Valley did not investigate this issue on its own; instead it relied completely on the representations of third parties as to the alleged "approval" of the transaction. If Valley did not direct its own counsel to verify the Department's enforcement intentions vis-a-vis the Kroy LBO transaction, it cannot complain if the reality of the Department's intentions differs from the representations made by counsel to other parties to the transaction. *Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir.1989).

Valley instructed its counsel that it need not verify these representations of informal approval with the Department of Labor itself. (Spector Dep. of January 24, 1991, at 93–94, Supp.App. F to the Secretary's Reply in Support of the Cross–Motion for Summary Judgment). In a letter dated December 17, 1986, submitted on behalf of Gunderson to the Trust Acceptance Committee of Valley, Gunderson wrote that there was a "No Action, No Comment Letter from the Department of Labor" (Trust Acceptance Committee Letter of December 17, 1986, Supp.App. V to id.; Hageman Dep. of February 20, 1991, at 103–09, Supp.App. C to id.), even though Gunderson, as he testified later, never saw such a letter. (Gunderson Dep. of June 25, 1987, at 46–47, Supp.App. A to id.). At best, failure to ascertain the truth of Kroy's assertions of the Department of Labor's approval can be characterized as gross negligence; at worst, as an outright fraud against the interests of the ESOP.

### 3. Secret Law (Fourth Counterclaim)

Valley in its Fourth Counterclaim argues that since the definition of "adequate consideration" *must* be regulated, a "dollar-for-dollar" equity allocation preference is a se-

cret rule and that therefore promulgation thereof must be via the Administrative Procedure Act (APA). Since the procedures for rule-promulgation under the APA were not followed, Valley continues, this lawsuit is improper. "The Secretary did not fulfill his statutorily based obligation to provide guidance concerning "adequate consideration". Rather, the Government practiced 'secret' agency law on an *ad hoc,* deal by deal basis." (Memorandum in Support of Valley's Opposition to the Government's Motion to Strike, 3). However, since the application of the adequate consideration standard does not involve the imposition of a secret law but instead involves the application of a fact-specific rule, Valley's Fourth Counterclaim must be dismissed.

Clearly, an enforcement agency cannot expect those within its jurisdiction to be able to adhere to the applicable rules or regulations when those guidelines fail to provide rational guidance. For example, it would violate due process to require that corporations "act nicely toward their competitors," since that standard is too vague to provide adequate guidance. The Government cannot constitutionally enforce laws that give no warning of what behavior constitutes violations thereof; hence the void-for-vagueness doctrine. Yet the cases cited by Valley in support of that proposition do not reach the facts of the instant case. *Satellite Broadcasting Co., Inc. v. F.C.C.,* 824 F.2d 1, 3–4 (D.C.Cir.1987), for example, held that the F.C.C. did not provide clear notice of what location would be the proper place to file applications for the operation of microwave radio stations. In the instant case, however, the statute forbids certain transactions without a determination by the responsible fiduciary that adequate consideration has been paid. This is not a "secret law" but a published statute easily looked up, with a body of case law interpreting it.

Similarly, *Gates & Fox Co., Inc. v. O.S.H.R.C.,* 790 F.2d 154, 156 (D.C.Cir.1986) (opinion by then-Circuit Court Judge Scalia) was decided against the agency, there the Occupational Safety and Health Review Commission, because the regulation in ques-

tion was unconstitutionally vague.[14] In that case the decision rested on the fact that the punishment faced was penal and the court expressed no opinion as to whether the regulation in question would be constitutional in a non-penal context. 790 F.2d at 156. Valley does not point out this distinction in its briefs, yet it is dispositive. What is often permissible in a noncriminal enforcement action may be prohibited in the criminal context.

The case of *Holmes v. N.Y.C. Housing Authority,* 398 F.2d 262, 265 (2d Cir.1968), is also inapposite. There the government actor was not directed by *any* guidelines. The court held that decisions must be taken in accordance with ascertainable published standards, a requirement clearly met in the instant case.

The facts of this case demonstrate that there was no imposition of any illegal or improper secret law. Valley contends that the "Government practiced "secret" agency law on an *ad hoc,* deal-by deal-basis, leaving ERISA fiduciaries with nothing more than a trail of unexplained past transactions and contemporaneous informal comments for guidance." (Valley's Consolidated Reply, 48). Valley's attempts to support this claim by noting certain comments made by Department officials in regard to this action and with certain inferences from these statements is unavailing.

On May 7, 1990, Morton Klevan, the Senior Director of Policy and Legislative Analysis at the DOL, addressed a seminar in New York City in a speech entitled "Update 1990: Employee Stock Ownership Plans." In this speech Klevan hinted that the instant case was filed as part of an effort to establish judicial precedent for the proposition that the use of ESOP funds in an ESOP-financed LBO should be established on a dollar-for-dollar equity basis. He stated: "I am speaking totally for myself and not for the Department" and in "my own personal view—I would be very comfortable with having a judge decide this case and this case being the guidelines." (Statement of Morton Klevan at Prentice–Hall Law and Business Seminar

---

**14.** Valley has not challenged the law in question here as unconstitutionally vague.

Entitled "Update 1990: Employee Stock Ownership Plans" of May 7, 1990, at 6, Ex. 11 to Memorandum in Support of Valley's Motion for Summary Judgment).

The instant suit was filed, Valley claims, in response to congressional criticism that the DOL's enforcement posture was too relaxed with regard to ESOP-financed leveraged buyouts. For support of this position they cite the testimony of Robert Davis, Solicitor of the Department of Labor, before the House Subcommittee on Labor–Management Relations of the Committee on Education and Labor on January 31, 1990. Davis stated, in reference to the case at bar, that "[i]n filing this case we have resolved an issue that's been kicking around for several years." He further noted that "[a]s we develop our litigation theory in that case the message will go out, and I will state it quite bluntly right now, that if the ESOP is responsible for 90 percent of the purchase price of the company they should get 90 percent of the common stock." (Hearing before the House of Representatives Subcommittee on Labor–Management Relations of the Committee of Education and Labor, 101st Cong, 2d Sess., of January 31, 1990, at 85, Ex. 17 to Memorandum in Support of Valley's Motion for Summary Judgment).

Davis' further statements reveal that there was no secret law applied since the Valley litigation was an example of the Department using "our existing authority." He stated that the enforcement and interpretation of ERISA standards in this case was "discretionary but we're tough cops, if you will, we should be making that enforcement judgment. In short, we have the authority and we should be using it." (Id. at 86). As the Government points out, the Secretary's use of this authority is unreviewable prosecutorial discretion.

ERISA § 502, 29 U.S.C. § 1132, vests in the Secretary the authority to enforce the fiduciary standards of Title I of ERISA. Wide discretion has traditionally been awarded to administrative prosecutions in the enforcement of the legal realms over which an agency has authority. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248, 100 S.Ct. 1610, 1616, 64 L.Ed.2d 182, 192 (1980). The enforce-ment of a statutory scheme is best left to the responsible agency since they alone are "empowered to develop that enforcement policy best calculated to achieve the ends contemplated by Congress and to allocate its available funds and personnel in such a way as to execute its policy efficiently and economically." *Moog Industries v. F.T.C.*, 355 U.S. 411, 413, 78 S.Ct. 377, 379, 2 L.Ed.2d 370, 373 (1958) (per curiam).

There is no mandate to the Secretary, no "shall" language, in § 1002(18)(B). The sentence "in accordance with regulations promulgated by the Secretary" governs if and only if a regulation is promulgated. It does not independently mandate the promulgation of any rule. The Secretary is allowed wide prosecutorial discretion and hence there is no "secret rule." Statutes, in order to maintain their viability, must be applied to new fact situations as they arise, as it is impossible for Congress to draft legislation with such specificity that they foresee in detail every factual situation that might arise. See, e.g., *Smith v. Pan Air*, 684 F.2d 1102, 1113 (5th Cir. 1982). Statutes are necessarily prospective in nature. *United States v. Browder*, 113 F.2d 97, 99 (2d Cir.1940), aff'd 312 U.S. 335, 339–340, 61 S.Ct. 599, 602, 85 L.Ed. 862.

Litigation is fact specific. Applying a standard to different cases is a mainstay of enforcement litigation. The Secretary's prosecution of this suit is not rendered ineffective by any lack of prior notice of how the Secretary might interpret ERISA in applying it to the facts of this instant case.

In any event, the DOL's equity allocation position was not so secret. In actuality, there has been much guidance as to what would be. considered by the Department as satisfying the requirement of "adequate consideration".

There was a September 12, 1983 letter from the Assistant Administrator for Enforcement, Pension And Welfare Benefit Programs, Charles M. Williamson, to Gareth Cook, in regard to Raymond International, Inc. (Appendix S to Secretary's Response to Valley's Rule 3(g) Statement). There was also a November 23, 1984 letter from the Counsel for Fiduciary Litigation, Plan Bene-

fits Security Division, Office of the Solicitor, Norman Goldberg, to Charles Smith, regarding Blue Bell Savings, Profit Sharing and Retirement Plan (Id.). Both letters raised concerns about the equity allocated to the ESOP in light of the ESOP's financial contributions. In addition, a July 30, 1985 letter from the Assistant Administrator for Enforcement, Pension and Welfare Benefit Programs, Charles Lerner, to Wilson Ellis, regarding The Scott & Fetzer Company Employee Stock Ownership Plan (Id.), raised similar concerns.

These letters have been the subject of great discussion in the ERISA community. At the 1986 ESOP Association Convention, Joseph S. Schuchert [15] gave a speech entitled: "Adequate Consideration" Determinations in Leveraged ESOP Transactions, May, 1986 (Attached as Appendix T to id.). In this speech he noted that in the Scott & Fetzer transaction the Department "concluded that if the ESOP issued a non-recourse note to acquire stock at, for example, $100 per share, ERISA demands that other investors providing cash to the transaction pay $100 per share." (Id. at 182).

Gregory Brown & Alan Hawksley also wrote an article, Fiduciary and Related Concerns in ESOP Leveraged Buyouts, Spring 1986 (Attached as Appendix U to id.), in which they addressed the question and noted the Department's stance on equity allocation. (Id. at 132–135).

The Secretary had outlined its dollar-for-dollar theory of equity allocation in a July 30, 1985 letter regarding the Scott & Fetzer Company Employee Stock Ownership Plan (reprinted at 12 Pens.Rep. (BNA) 1182 (August 26, 1985), Ex. D. to Reply in Support of Secretary's Motion to Strike). This position was widely discussed in the ESOP community. Indeed, Webster & Sheffield referred to this letter in its December 23, 1986 legal opinion to the Kroy ESOP trustee. (Ex. B to Memorandum in Support of the Secretary's Motion to Strike, 17–21).

"In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United*

*States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547, 556 (1985). Given the fact that such wide discretion is available to the government in the criminal context, Valley's contention that in the context of a civil enforcement action such discretion is not available to the government is unpersuasive. The DOL simply cannot be required to promulgate regulations covering every conceivable aspect of ERISA before advocating its interpretation of the statute in a lawsuit. Any other rule would seriously impair the DOL's ability to enforce the requirements of the statute.

A criminal prosecutor enjoys the advantages of great latitude in enforcement, *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 611 (1978), and civil enforcers enjoy even greater latitude, since the principle that ambiguities in criminal statutes must be resolved in favor of lenity does not apply to the civil enforcement context. *United States v. Batchelder,* 442 U.S. 114, 121, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755, 763 (1979). See also *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).

The Secretary had no duty to warn Valley that its conduct would or could violate ERISA. There is no support for the proposition that the Pension and Welfare Benefits Administration has such a duty. Thousands of ERISA-covered transactions take place every day, each of which presents its own set of facts, many of which are quite novel. The fiduciaries who cause plans to engage in such transactions are responsible for determining whether their own conduct, novel or not, violates ERISA.

Valley was well aware that it had such an independent duty. Its ESOP counsel, Webster & Sheffield, warned that the "DOL has indicated that the determination of "adequate consideration" must be made on a case by case basis by the plan trustees or appropriate named fiduciaries.... In addition, the DOL has announced that it will not issue advisory opinions concerning whether the adequate consideration requirement has been

ESOP who managed to secure congressional approval of ESOPs.

met in any particular case." (Ex. B to Memorandum in Support of the Secretary's Motion to Strike, 17–18). For Valley to claim that its failure to determine whether adequate consideration was paid entails no adverse enforcement consequences for it has no basis in fact or in law.

### 4. No Notice and Comment (Fifth Counterclaim)

■■■ Valley argues in its Fifth Counterclaim that in violation of 5 U.S.C. § 553 there was none of the statutorily required notice and comment when the Secretary adopted the "rule" of dollar-for-dollar equity allocation. Notice of all proposed rulemaking by an agency must be published in the Federal Register, and a time and place noticed to be the locus of the rulemaking proceeding. 5 U.S.C. § 553(b). All interested persons are thus afforded an opportunity to participate in the rule making through submission of evidence and sometimes with oral presentation. 5 U.S.C. § 553(c). This notice and comment must be provided when an agency adopts a rule or when it changes a rule. *Motor Vehicles Mfrs. Association v. State Farm Mut.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■■■ The APA is not applicable in this case. First of all, the issue is not the adoption of a rule, but the application of a standard. Dollar-for-dollar is not a "rule" subject to APA § 553; it is a fact-intensive application of a statutory standard. The Secretary's case-specific application of the statutory "adequate consideration" requirement is not a rule subject to the confines of congressionally mandated rule making procedures.

The function of filling in the interstices of an Act's regime is the duty of the agency charged with enforcement of that Act's requirements and may be carried out via case-by-case adjudication. A "problem may be so specialized and varying in nature as to be impossible to capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-

case evolution of statutory standards." *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947). The "choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." Id. See also *N.L.R.B. v. Bell Aerospace, Co.*, 416 U.S. 267, 294–295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134, 153–54 (1974).

Where an agency has been delegated the power and the responsibility to make law and policy through rulemaking, "adjudication operates as an appropriate mechanism not only for factfinding but also for the exercise of delegated lawmaking powers, including lawmaking by interpretation." *Martin v. O.S.H.R.C.*, 499 U.S. 144, 154, 111 S.Ct. 1171, 1177, 113 L.Ed.2d 117, 130 (1991).

### B. Valley wants to force the Secretary to promulgate a regulation defining adequate consideration (Valley's First Counterclaim)

■■■ Since 29 U.S.C. § 1002(18)(B) does not define adequate consideration but refers to regulations promulgated by the Secretary, Valley contends that the Government has the duty to promulgate further defining regulations. For a variety of reasons, Valley's first counterclaim must also be dismissed.

In the first place, the Secretary challenges jurisdiction in this court on the ground that jurisdiction to compel rule promulgation by the Department under ERISA lies only in Arizona or in the District of Columbia. Under ERISA § 502(k), 29 U.S.C. § 1132(k), a civil action brought against the Department "by an administrator, fiduciary, participant, or beneficiary of an employee benefit plan to review a final order of the Secretary, to restrain the Secretary from taking any action contrary to the provision of this chapter, or to compel him to take action required under this subchapter, *may be* brought in the district court of the United States for the district where the plan has its principal office, or in the United States District Court for the District of Columbia." (emphasis added) It appears that the quoted language is permissive not mandatory.

However, this section provides for suit against the Secretary only to compel action "required under this subchapter" and since the promulgation of regulations pertaining to adequate consideration is not required, suit against the Secretary cannot be maintained under § 1132(k).

The DOL argues that Valley's claim to compel promulgation is not a compulsory counterclaim under Rule 13(a), since it does not arise out of the same transaction or occurrence as the plaintiff's claim, and thus, it is claimed, the Secretary did not waive her § 502(k) defense by bringing this lawsuit in the Southern District of New York.

Even assuming arguendo that this claim is properly brought in this judicial district, it should be dismissed on the merits as without basis in law or in fact. 28 U.S.C. § 1361 provides that a mandamus action to compel government actors vests jurisdiction in the district courts to "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Under 29 U.S.C. § 1132(k) the promulgation of the regulation must be "required." Since that is not the case here, no action to compel promulgation will lie. Discretionary acts of the Secretary of Labor cannot be compelled via § 1132(k). See, e.g. *Dillon v. Dole*, 11 E.B.C. 2185, 1989 WL 162389 (E.D.Ark. October 25, 1989). As noted above, the decision to promulgate a regulation in regard to adequate consideration is entirely discretionary. There is no affirmative duty here, as noted above, since all relevant language is permissive.

ERISA § 505, 29 U.S.C. § 1135, provides that "the Secretary may prescribe such regulations as he finds necessary and appropriate to carry out the provisions of this title. Among other things, such regulations may define accounting, technical and trade terms used in such provisions." The language of this section is quintessentially permissive, such that the Secretary's action or inaction under this section is not subject to judicial review under APA § 701(a)(2). There is no "shall" language which would make the failure to promulgate reviewable by this court. See, e.g. *United States v. Terrill*, 688 F.Supp. 542, 546 (W.D.Mo.1988).

Since the promulgation of the rule requested by Valley is committed to agency discretion by law, there can be no judicial review of the Secretary's failure to so promulgate. *Heckler v. Chaney*, 470 U.S. 821, 828, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714, 719–20 (1985); *Marlow v. U.S. Dept. of Educ.*, 820 F.2d 581, 582 (2d Cir.1987).

In any event, the absence of a regulation further defining adequate consideration does not in any way exculpate Valley from liability for ERISA violation. The Fifth Circuit's expressed belief that it would be desirable for the Secretary to promulgate regulations defining adequate consideration, an expression upon which Valley hinges a great deal of its argument, did not stop that court from analyzing the case before it to determine whether such adequate consideration was in fact paid. *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir.1983).

Valley has no legitimate complaint. It's not as if adequate consideration is a factor that, without further statutory guidelines, provides no guidance on its own. Countless breach of contract suits, for example, hinge upon the determination of "adequate consideration" and the parties to those suits are charged with responsibility for determining in advance, in order to avoid a civil suit, what constitutes such consideration.

## IV. THE SECRETARY'S MOTION TO STRIKE OR DISMISS VALLEY'S AFFIRMATIVE DEFENSES

Valley in its answer asserted several affirmative defenses which, pursuant to F.R.Civ. Proc. 12(f), the Department of Labor has moved to strike or dismiss. Under 12(f) a party may move to strike "from any pleading any insufficient defense." Valley has counter-moved for summary judgment on these defenses and in response the Secretary has cross-moved for summary judgment in addition to its motion to dismiss.

Valley's affirmative defenses hinge upon the assertion that the Kroy LBO transaction had already passed Departmental muster through the informal review process which Valley claims existed and which Valley alleges constituted a stance of "no action" on the

part of the Secretary. This claim is based upon the contents of a letter written by Patterson attorneys (Joseph Simone signed it) to Virginia Bartlett, which reads in its entirety:

Dear Ms. Bartlett,

This is to confirm the conversation that Fred Green and I had with you today regarding the Kroy ESOP Transaction. We understand that the Department of Labor (DOL) has received all of the information that it requested in order to review the ESOP Transaction, that at this time you have no comments regarding the ESOP Transaction and that the DOL does not object to the closing of the ESOP transaction on or after Thursday, December 18, 1986.

We will furnish the final documents and IRS submission to your office promptly after the transaction is closed. We will also forward any documents which are revised in the event that a corporate trustee is substituted for the present plan committee and individual trustees.

It has been a pleasure working with you and your colleague in concluding this matter.

The letter, dated December 15, 1986, was addressed to "Ms. Virginia Bartlett, Division of Investigation, U.S. Department of Labor, Pension and Welfare Benefits Plans Division." A close analysis of the undisputable facts, this so-called no action letter and the law indicates that Valley's affirmative defenses should be dismissed and summary judgment granted on behalf of the Secretary in regard to these affirmative defenses. These defenses shall be discussed seriatim.

A. Statute of Limitations (Second Affirmative Defense)

It appears that Valley's invocation of this defense is merely part of a scattershot approach to defending this suit. Valley provides no support for this defense in its papers.

29 U.S.C. § 1113 requires suit to be brought "within six years of the date of the last action which constituted part of the breach of fiduciary duty or three years after the earliest date on which the [Secretary] had actual knowledge of the breach, whichever is earlier." *Katsaros v. Cody*, 744 F.2d 270, 280 (2d Cir.1984). The closing of the Kroy LBO transaction was on December 23, 1986. The instant lawsuit was brought on December 18, 1989. Hence, no statute of limitations bar applies. This defense is dismissed.

B. Estoppel (Third Affirmative Defense)

██ Valley's estoppel defense is premised upon the Secretary's failure to object to the Kroy LBO transaction prior to closing. (See, e.g. Memorandum in Support of Valley's Opposition to the Government's Motion to Strike, 22–26).

While the Supreme Court has not yet announced an across-the-board no estoppel rule in suits against the Government, the defense of estoppel has always been found to be unavailing against the government. *Heckler v. Community Health Services*, 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42, 52 (1984) ("[W]e are hesitant ... to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealing with their Government") (footnote omitted; emphasis in original); *Office of Personnel Management v. Richmond*, 496 U.S. 414, 423, 110 S.Ct. 2465, 2471, 110 L.Ed.2d 387, 398 (1990). When the facts of this case are compared to others in which the Supreme Court has found that no estoppel defense would lie against the Government, it becomes clear that no estoppel defense lies in this case as well.

Valley claims that an estoppel defense is only barred when payment from public fisc is sought. This is clearly wrong, and the cases cited for this proposition certainly do not support it.[16] If anything, the case cited indicate that the Supreme Court is quite close to adopting an across-the-board no estoppel rule, especially since the only two Justices

---

**16.** *Office of Personnel Management v. Richmond*, 496 U.S. 414, 425–27, 110 S.Ct. 2465, 2472–73, 110 L.Ed.2d 387, 399–400 (1984), for example, clearly indicates the opposite.

who dissented in both *Heckler* and *Office of Personnel Management,* Justice Brennan and Justice Marshall, are no longer on the court. Nevertheless, Valley alleges that in this case the unfair behavior by the Government is so shocking as to call for the imposition of an estoppel against the government.

.Here, Valley avers, there is "a pattern of patently unfair conduct devised and sanctioned by all appropriate policymakers at the DOL." (Valley's Consolidated Reply in Support of Its Motion for Summary Judgment and Response to the Government's Cross–Motion for Summary Judgment, 36). It is quite clear that regardless of how one describes the Department's behavior here, there was not a pattern of conduct "devised and sanctioned by *all* appropriate policymakers."

The Supreme Court has stated that while it has never gone so far as to adopt an across-the-board no estoppel rule, it has "reversed every finding of estoppel that [it has] reviewed." *Office of Personnel Management,* 496 U.S. at 422, 110 S.Ct. at 2470, 110 L.Ed.2d at 398; *Utah Power & Light v. United States,* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917).

"When the government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Community Health Services,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42, 52 (1984) (footnote omitted).

The elements that might call for estoppel are not present in this case. In the first place, there was no representation since there was no approval of the transaction by the Secretary. In the second place, even were there any manifestation of approval, it was unauthorized and improper and thus could not establish an estoppel against the Government. In the third place, any reliance by Valley was unjustified as a matter of law. A fuller discussion of the Department's behavior prior to the closing on December 23,

1986 will reveal fully the emptiness of Valley's estoppel defense.

*There was no pre-closing approval by the Secretary*

As internal memoranda discussing problems with the proposed LBO transaction reveal, the Secretary did entertain concerns about the Kroy LBO transaction prior to closing. (See, e.g., Ex. M to Valley's Response to the Secretary's Rule 3(g) Statement in Support of her Cross–Motion for Summary Judgment, a November 13, 1986 Memorandum Concerning the Preliminary Proxy Statement of Kroy, Inc., from Sherwin Kaplan to Charles Lerner, Associate Director of Enforcement (recommending "that a case be opened and additional records requested concerning the ESOP's involvement in the transaction.... After reviewing these records, it may be necessary to schedule a meeting with the ESOP's trustees, valuation consultant and counsel, if it appears that the matter is still worth pursuing"). The investigation of the transaction was opened on November 21, 1986. (*Id.,* Ex. L). The Department's concerns were not allayed and the investigation was not concluded by the date of the closing, Dec. 23, 1986. (*Id.,* Ex. N, Kaplan Dep. of February 13, 1992, at 300–04; *Id.*).

Gunderson testified that as to Patterson's alleged "approval" from the Department, Gunderson had reviewed only one letter, the letter enclosed with Mr. Green's December 15, 1986 letter to Gunderson. (Gunderson Dep. of June 25, 1987, at 36–37, attached as Supp.App. A to the Secretary's Motion for Partial Summary Judgment). "With respect to the no closing without DOL approval, these two points require some interpretation, since I understood and still understand that the Department of Labor does not, did not at that time approve, issue formal approval of ESOP transactions." (Gunderson Dep. of Feb. 6, 1991, 67, attached as Ex. I to Valley's Response to the Secretary's Rule 3(g) Statement in Support of Her Cross–Motion for Summary Judgment).

Valley had notice that there was no informal review procedure and that they had an independent fiduciary duty to investigate the fairness of the transaction to the ESOP

themselves. Spector testified that he specifically advised Valley that it had an independent duty to investigate the transaction to determine prudence, fair market value, and the advisability of the ESOP participating in the transaction. (Spector Dep. of March 6, 1992, at 173–76; Supp.App. F to the Secretary's Motion for Partial Summary Judgment).

Valley further urges that Bartlett's affirmative misrepresentations satisfy the representation element of an estoppel claim. "What is relevant is that Ms. Bartlett told the Kroy participants that the Department of Labor had no objection." (Valley's Consolidated Reply in Support of Its Motion for Summary Judgment and Response to the Government's Cross–Motion for Summary Judgment, at 32). "Told," however, is an active verb. Kappa's attorneys claimed that Bartlett said that the Government had no objection—that is not equivalent to Valley being "told".[17] There is no evidence whatsoever that the Department "approved" the Letter, or that the Letter "confirmed" a position already taken by the Department. A close reading of this letter indicates with no doubt that there was no approval on record. *Any manifestation of approval was unauthorized and non-binding on the Government.*

Unauthorized statements by its agents do not bind the Government. Close analysis of the relevant case law reveals that in cases where the alleged misrepresentation was far more egregious, the Supreme Court has held that there is no estoppel.

As has been noted above, the Government cannot be estopped by the ultra vires statements of its personnel. There is a long-standing rule that the Government will not be estopped by the the statements of employees when the asserted estoppel will nullify a requirement statutorily prescribed by Congress, *Office of Personnel Management v. Richmond,* 496 U.S. 414, 418–19, 110 S.Ct.

2465, 2468, 110 L.Ed.2d 387, 395 (1990). In this case, the requirement in question is that a certain transaction taken on behalf of an ESOP be for adequate consideration. If the actions by Valley violated the law, the comments of a person unauthorized to bind the Department will not estop the Government from an enforcement action. "[T]he United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Utah Power & Light,* 243 U.S. at 409, 37 S.Ct. at 391, 61 L.Ed. at 818.

The statements of an individual not authorized to bind the government cannot form the basis of an estoppel defense. "The government could scarcely function if it were bound by its employees' unauthorized representations." *Goldberg v. Weinberger,* 546 F.2d 477, 481 (2d Cir.1976) (pointing out at 546 F.2d 481 n. 5 that only when the government employee is statutorily mandated to provide correct instructions can a finding of estoppel against the government even be possible, as it was in *Rodriguez v. I.N.S.,* 532 F.2d 301 (2d Cir.1976), circumstances clearly absent in the case at bar). "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making process. And this is so even though, ... the agent himself may have been unaware of the limitations upon his authority." *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10, 15 (1947).

Virginia Bartlett had no authority to express any position on behalf of the Department in regard to the Kroy LBO transaction.

17. The text of the letter itself does not support Valley's contention that they were "told" that the Government had no objection to the transaction. The Letter stated that "We [the attorneys at Patterson] understand that the Department of Labor ... at this time [has] no comments regarding the ESOP transaction and that the DOL does not object to the closing of the ESOP transaction on or after Thursday, December 18, 1986." Patterson's belief that the Department had no comments at the time and that at the time the DOL did not object to the closing does not remotely support Valley's contention that they, Valley, were told *by the Department* that it had approved the transaction.

(Reply in Support of the Secretary's Cross–Motion for Summary Judgment, 4–6). Valley has the burden of showing that Bartlett was authorized to express a position on behalf of the Secretary, a burden they have failed to shoulder, or even to address. DOL officials testified that she was not "authorized to express any position on the transaction." (Kaplan Dep. of February 13, 1992, at 245, Ex. B to Secretary's Reply to Valley's Rule 3(g) Statement). For Bartlett to act otherwise would violate Departmental procedures. (Kaplan Dep. of February 13, 1992, at 236–39, Supp.App. to the Secretary's Reply in Support of her Cross–Motion for Summary Judgment).

Valley's own expert on the standard of care owed by a fiduciary, Jeffrey Clayton, testified that based upon his experience within the DOL, officials such as Bartlett lacked the authority to speak to parties engaged in a transaction such as the one in the case at bar on behalf of the DOL. (Clayton Dep. of October 2, 1992, at 535, Supp.App. G to id.)

Valley cites *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) and *Azizi v. Thornburgh,* 908 F.2d 1130 (2d Cir.1990) to argue that certain Government conduct is affirmative misconduct warranting the imposition of an estoppel defense against an enforcement action. Valley contends that the DOL's behavior failed to meet even a minimal standard of decency.

A closer reading of those cases reveals that they do not support Valley's position. *Office of Personnel Management* has been discussed supra. In *Azizi,* plaintiff was deported even though an Administrative Law Judge and the Immigration and Naturalization Service informed him, erroneously as it later turned out, that his actions would immunize him from deportation and allow him to receive a visa. INS wrongfully issued plaintiff a visa but then sought to deport him. The Second Circuit approved the deportation, and found no estoppel because the Government's actions were not deemed to constitute "affirmative misconduct" but only negligent conduct. *Azizi,* 908 F.2d at 1136.

Clearly, in *Azizi* the penalty to the party asserting estoppel was far more serious than the mere monetary penalty to be imposed in the instant case. The conduct of the Government in *Azizi* was far more objectionable. There the Government actually told plaintiff he would not be subject to deportation and even approved in writing a petition for an immigrant visa. In the instant case, on the other hand, no such formal approval was ever issued. If the *Azizi* court found no affirmative misconduct, then clearly the alleged behavior of which Valley complains, even if there was any evidence supporting it, can not legally amount to affirmative misconduct.

*Any reliance by Valley was unjustifiable*

Valley asserts that the Kroy transaction would not have gone forward with Valley as fiduciary causing the ESOP to invest $17.5 million if the Secretary told the Kroy participants in advance that the transaction was unacceptable to the Government. This is eminently believable. Very few persons would go through with a transaction or with any action if they knew that doing so would subject them to the enforcement powers of a government agency. After-the-fact rationalizations are legally irrelevant. Valley's assertion that the instant suit renders Valley a scapegoat for criticism of the Department of Labor is not persuasive. The only legally relevant inquiry is whether or not they violated the law. Valley had a duty at the time of the transaction to independently assess the facts available to them and seek additional facts if needed in order to determine if the transaction would pass legal muster.

Valley insists that it appropriately relied on the "approval" of the Department, for "there was absolutely no reason for Valley to second guess the Government's position, which was documented in a confirming letter." (Valley's Consolidated Reply in Support of Its Motion for Summary Judgment and Response to the Government's Cross–Motion for Summary Judgment, at 32). This "confirming" letter, however, was not a Department transmission but instead was sent by counsel at Patterson, the law firm representing Kappa. Valley is arguing, essentially, that a fiduciary to one interested party can rely on a representation of governmental approval by a counsel to another interested party to the transaction. As Valley should

well have known, Kappa had every reason to state to Valley that there was DOL approval. Valley had an independent fiduciary duty to ascertain the facts since it, and not Patterson, represented the interests of the ESOP. Kappa had every reason to promote the conception that the Department had approved the transaction since the existence of Kappa as a corporate entity was contingent on the transaction being consummated, as it was created for that express purpose.

The attorneys who maintained contact with the Department worked for the Kappa Acquisition Corporation and not for Valley or the ESOP. Valley had an independent duty stemming from its position as fiduciary to investigate the facts for itself and could not rely on counsel for another party. The purpose of an ESOP trustee is to guard the interests of the ESOP as fiduciary because in LBO transactions like this one the ESOP is likely to have its interests overlooked, and subordinated to those of the other parties. To rely on the representations of Kappa's counsel, an interested party, is to overlook Valley's fiduciary duty to make an independent investigation.

Valley was advised explicitly of its fiduciary responsibilities in a 33–page opinion letter from ESOP trust counsel dated December 23, 1986, which said nothing about the Department of Labor's supposed "review" or "approval" of the proposed transaction. This opinion letter states quite clearly what Valley's duty was and what guidance it could expect from the Department in regard to whether adequate consideration had been paid:

> The DOL has not yet promulgated the regulation which, under the foregoing definition, will govern determinations of the value of securities, such as the Stock, for which there is no generally recognized market. In the absence of such regulations, the DOL has indicated that the determination of "adequate consideration" must be made on a case by case basis by the plan trustees or appropriately named fiduciaries in light of all relevant facts and circumstances. DOL Opinions 76–52 (May 19, 1976), 76–88 (September 2, 1976) and

82–20A (April 15, 1982, and DOL Information Letter (United Companies Financial Corporation Employee Stock Ownership Plan, February 25, 1982). *In addition, the DOL has announced that it will not issue advisory opinions concerning whether the adequate consideration requirement has been met in any particular case.* Section 5.02(a) of ERISA Procedure 76–1, 41 Fed. Reg. 36,281, 36,282 August 27, 1976).

(Webster & Sheffield Letter of December 23, 1986, Supp.App. D to the Secretary's Reply in Support of her Cross–Motion for Summary Judgment, 17–18 (emphasis supplied)).

Valley's independent duty precludes any finding of such reliance on any purported approval issued to Kappa. "While a trustee has a duty to seek independent advice where he lacks the requisite education, experience, and skill, the trustee, nevertheless, must make his own decision based on that advice." *Whitfield v. Cohen,* 682 F.Supp. 188, 194 (S.D.N.Y.1988).

The December 23, 1986 opinion letter of Webster & Sheffield to the ESOP trustees advised them that such an independent duty existed. Yet, as Gunderson testified, Valley did not at any time feel that it should have contacted the Department on behalf of the ESOP to determine for itself whether such approval as is now claimed to estop the Secretary ever in fact existed. A multimillion dollar investment was committed without even a phone call to determine if indeed the Department "approved" the transaction. (Gunderson Dep. of February 6, 1991, at 68, attached as Ex. I to Valley's Response to the Secretary's Rule 3(g) Statement in Support of Her Cross–Motion for Summary Judgment (testifying that on December 17, 1986 he "agreed not to make independent calls to the Department of Labor and potentially confuse who was going to be notified in the event of any changes")).

Any time the Department did object preclosing or express acquiescence in closing it was through written letters, not alleged oral transmissions. Valley is charged with having to know this requirement, especially since ERISA Proc. 76–1 makes this so clear.[18]

---

18. Valley knew from prior transactions that it had to obtain written approval from government

Those who deal with a government agency have a duty to familiarize themselves with its requirements and to obtain assurances if they need them from the agency in writing. *Heckler v. Community Health Services,* 467 U.S. 51, 63–65, 104 S.Ct. 2218, 2225–26, 81 L.Ed.2d 42, 54–55 (1984). See also *REA Express, Inc. v. United States,* 568 F.2d 940, 948 n. 10 (2d Cir.1977). Valley's professed reliance on Ms. Bartlett's alleged comments was tantamount to a complete abdication of its fiduciary obligations. See, e.g. *Whitfield v. Cohen,* 682 F.Supp. at 194; *Withers v. Teachers Retirement System, etc.,* 447 F.Supp. 1248, 1254 (S.D.N.Y.1978), aff'd 595 F.2d 1210 (2d Cir.1979).

*Conclusion: No estoppel lies against the DOL*

To establish an estoppel defense, Valley must show that the Secretary acted in a truly horrendous manner, e.g. willfully, wantonly, and recklessly, as only the "most serious of circumstances" will allow equitable estoppel against the United States. *U.S. v. RePass,* 688 F.2d 154, 158 (2d Cir.1982). See also *Fano v. O'Neill,* 806 F.2d 1262, 1265–66 (5th Cir.1987). This Valley has clearly failed to do.

Since the case at bar involves discretionary governmental conduct not bound within the confines of mandatory regulations and parties who are certainly not as naive as an illegal immigrant facing deportation, no finding of estoppel against the Government is warranted. Any governmental misconduct was less than that of *Utah Power & Light,* or in the immigration cases where courts, including the Supreme Court, have upheld the severe penalty of deportation even where the petitioner relied on *written* guarantees by the government actors in question. See *I.N.S. v. Miranda,* 459 U.S. 14, 103 S.Ct. 281,

74 L.Ed.2d 12 (1982); *Montana v. I.N.S.,* 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961).

No injustice will be worked by denying the estoppel defense: all parties here are large corporations, well-represented by counsel.[19] These are not naive individuals who may be forgiven for not knowing the law that governed their behavior. *Contra Corniel–Rodriguez v. I.N.S.,* 532 F.2d at 301; *Cook v. Pension Benefit Guarantee Corp.,* 652 F.Supp. 1085, 1091 (S.D.N.Y.1987) ("This is not a case in which a naive plaintiff has been misled by an official who ignored mandatory regulations"). This affirmative defense is dismissed as well.

### C. Laches (Third Affirmative Defense)

Valley argues that even though the Government filed this action within the period called for in the appropriate statute of limitations, it is still barred by the doctrine of laches. (Memorandum in Support of Valley's Opposition to the Government's Motion to Strike, 26–29).

Valley is quite correct in asserting that laches is "independent" of a statute of limitations defense. *Hoelzer v. Stamford,* 933 F.2d 1131, 1137 (2d Cir.1991). However, the mere fact that laches and statute of limitations are "independent" is not relevant to the inquiry of whether compliance with the second bars the defense of the first. Indeed, in *Hoelzer* the court found that since the statute of limitations was complied with, there was no bar to the city of Stamford seeking to reestablish ownership of certain art works in plaintiff's possession. Nothing in that case supports the proposition that laches will bar an otherwise timely enforcement action.

Valley's claim that the Government in fairness is precluded from pursuing this action because they did not protest the transaction

---

agencies. When it was trustee to the Combined Communications Corporation ESOP in 1976, it had Snell & Wilmer, the Arizona counsel representing it in that and in the present case, write to the Securities and Exchange Commission to discern the applicability of the Securities Act of 1933. (See SEC No–Action Letter Re Combined Communications Corporation Employee Stock Ownership Plan, compiled at 1976 SEC No–Act. LEXIS 1128). If they knew in 1976 that approv-

al of government actors had to be obtained in writing, then they cannot now claim that they were unaware of such a requirement.

**19.** This stands in contradistinction to *Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), where the Court held that no estoppel would lie even though defendant, a nonprofit local health service provider, might be forced into bankruptcy.

before it closed is unpersuasive. The Government's "failure" to affirmatively protest the transaction prior to closing does not legally bar a later enforcement action, as has already been discussed.

██ Laches is not available as a defense against the United States where the statute of limitations is complied with. *United States v. RePass,* 688 F.2d 154, 158 (2d Cir. 1982); *Donovan v. Cody,* 5 Empl.Ben.Cases (BNA) 1773, 1774 (E.D.N.Y.1984).

Laches cannot be invoked against the federal government where it acts in its sovereign capacity either to "enforce a public right or protect a public interest." *Donovan v. Cody,* 5 Empl.Ben.Cases at 1774; *U.S. v. Arrow Transportation Co.,* 658 F.2d 392, 394–95 (5th Cir.1981). It is within the public interest to protect the financial integrity of employee benefit plans. Enforcement actions like the instant lawsuit are the mechanism by which this interest is protected. See e.g. *Donovan v. Cody,* 5 Empl.Ben Cases (BNA) 1773, 1774 (E.D.N.Y.1984).

The Department had no obligation to object to a transaction prior to closing and thus Valley cannot complain if its conduct was found in violation of the statutory guidelines set forth in ERISA and Valley subjected to a post-closing enforcement action. Almost all government action takes place after the violative behavior in question takes place. Valley had an independent fiduciary duty to insure that its behavior complied with statutory norms before the transaction closed and it could not rely on the government agency entrusted with enforcement of ERISA actions stopping Valley before it violated the statute. Accordingly, this defense is dismissed.

**D. Misrepresentation Amounting to Affirmative Misconduct (Fourth Affirmative Defense)**

Valley alleges on the part of the Secretary misrepresentation amounting to affirmative misconduct. Valley alleges that the Secretary allowed the Kroy LBO transaction to go forward and then used the instant enforcement action as a test case. This affirmative defense is closely related to Valley's estoppel claim, and for largely the same reasons summary judgment should also be granted for the Secretary on this issue.

It is alleged that the law firm of Patterson conferred with various Departmental officials because their prior experience led them to believe that Bartlett was authorized to speak for the Department and that Bartlett then approved the LBO. "The practice was *universally recognized* as the only practical way to obtain guidance available for ESOP leveraged buyout transactions." (Memorandum in Support of Valley's Motion for Summary Judgment, 40 (emphasis supplied)). Bartlett allegedly visited the Patterson office and "reviewed" the Kroy LBO transaction. (Memorandum in Support of Valley's Opposition to the Government's Motion to Strike, 13).[20]

The misrepresentation defense is premised on the assertion that the DOL reneged on its prior review and approval because of its desire to use the prosecution of Valley as a test case. Valley claims that the Department's test case prosecution in regard to a previously approved transaction constitutes affirmative misconduct.

Valley's argument in regard to this claim is, to say the least, unpersuasive. As has been noted, the Government has no obligation to halt illegal transactions pre-closing. This defense is merely a misplaced estoppel defense.

467 U.S. at 62, 104 S.Ct. at 2225, 81 L.Ed.2d at 53.

**20.** The record reveals, however, that Bartlett's review of the documents at Patterson's office is somewhat lesser in scope than Valley represents. A brief excerpt from the deposition record in regard to Bartlett's office visit is illuminating:

Q. Do you know what Ms. Bartlett was doing in New York on that day [December 3, 1986]?

A. I recall that she was in New York on some other business.

Q. Not connected?

A. Not connected to the Kroy transaction.

Q. Okay. When you say that she met with you at the Patterson, Belknap offices, exactly where did she meet with you?

A. In the reception area.

Q. Were you standing up or were you sitting down?

A. We were standing up.

Q. About how long did your—did this last?

A. No more than five minutes.

Green Dep. of March 27, 1992, at 60 (attached as Ex. G to Valley's Response to the Secretary's Rule 3(g) Statement).

Valley points to no rule or regulation that authorizes this pre-closing review. In addition, there are no representations whatsoever from the Government here, only letters to the Department from Patterson lawyers who represented Kappa Acquisition Corporation. Even if these letters had been sent by the Department, they would not bar this action, as will be discussed below.

The Government has wide latitude to choose when to enforce its laws. The occurrences upon which Valley seeks to erect its "informal approval procedure" amount to nothing more than the usual exercise of the Secretary's enforcement discretion. The informal review procedure that Valley claims immunizes it from the instant enforcement action exists nowhere outside the confines of Valley's briefs. Any pre-closing contacts that the DOL entertained with attorneys representing participants to certain ESOP transactions were at the initiation of the lawyers involved. Attorneys at Patterson initiated and proposed these contacts. Arthur Kroll, a senior partner at Patterson, testified that it was Patterson's practice to present as much as possible to the DOL before closing as a means of minimizing the possibility that there would be a post-closing enforcement action. (Kroll Dep. of March 31, 1992 at 14, 36, 51–52, 98, attached as Appendix G to the Secretary's Response to Valley's Rule 3(g) Statement).[21]

An associate from Patterson at that time, Michael Segal, testified that this practice was undertaken with the express purpose of creating an estoppel argument against the DOL in the event that an enforcement action was undertaken at a later date. (Segal Deposition of March 24, 1992, at 18–22 (Segal Dep.), attached as Appendix J to the Secretary's Response to Valley's Rule 3(g) Statement; see also Consolidated Brief in Support of the Secretary's Cross–Motion for Summary Judgment and in Opposition to Valley's Motion for Summary Judgment at 27–34).

While a statement of a former employee of Patterson is not by itself sufficient to prove the truth of the matters asserted within, when considered in conjunction with the other voluminous evidence provided, it indicates that Patterson was perfectly aware that their practice of showering the DOL with pre-closing documents did not amount to an approved review process, formal or informal, that would legally bar the Secretary from later enforcement action. It also indicates that the alleged "no action" letter sent to the Department did not amount to a manifestation of the Department's "informal review and approval" but instead was part of a campaign to forestall possible future enforcement action.[22]

The actual text of the letter asserted by Valley to "prove" that that the Secretary approved the transaction does no such thing. Even assuming that the letter was transmitted to Valley (and not to Patterson for Kappa Acquisition Corporation) from the DOL (instead of to the DOL), the clear language of the letter would not act to bar a later enforcement action.

---

21. The evidence indicates in fact that even the attorneys from Patterson, in particular Simone, knew that there was no such informal review. At one point First Bank Minneapolis, prior to approving the financing arrangement for the LBO, attempted to insert in the loan arrangement a requirement that the Department approve the transaction pre-closing. Simone, however, in an October 31, 1986 letter to Jared Kaplan, the ESOP counsel to First Bank, insisted that the provision requested by First Bank not be included because the Department of Labor did not have a practice of issuing such approvals. "The DOL does not issue approvals for these deals." (Simone Letter of October 31, 1986, to Kaplan (Simone Letter), Appendix N to Secretary's Response to Valley's Rule 3(g) Statement; Simone Dep. of March 26, 1992, at 332–33).

22. That is not to say that such a practice is necessarily inadvisable. In many instances it is helpful to show proposed courses of action to enforcement authorities as a means of increasing the chance that a legally questionable practice will be halted before the parties are too deep into the process to escape liability. It does not, however, forestall future enforcement action. One always takes the risks that one's actions are illegal. It is not the duty of the government to inform all possible lawbreakers before the proposed conduct they are considering that they are in danger of committing a prohibited act; rather, it is the duty of every individual and entity to conform their behavior to the law. Large corporate entities such as Valley, with access to experienced ERISA counsel, are held to this standard just as individuals are with far less money and fewer legal resources.

First, the letter states that the Department has "no comments" regarding the pending transaction. The proposition that the Government has to comment on whether proposed action by a private party will violate the law is a dangerous one. The Government does not issue advisory opinions absent explicit statutory or regulatory direction. Such direction is absent here.

Secondly, the letter notes that the Department did "not object" to the closing at the present time. This statement is legally irrelevant. The Government has no obligation to object. If the investigation of a transaction is ongoing, as it was in this case, to force the Government to object by the closing, a time set by the possible target of an enforcement action, lets wrongdoers set the timetable for the Government's enforcement of the legal norms established by congressional will and the democratic process. The timetable for law enforcement is not set by its targets.

Third, there is no statement in the letter that "no action" is contemplated. In the regulatory context, when approval letters are issued by government agencies of pending transactions, such as by the Securities and Exchange Commission, they are denominated "no action" letters, and the words "no action" are explicitly used. Such language is strikingly absent from the letter.

Given Segal's testimony, the mass of additional evidence, and the actual text of the letter, summary judgment on this claim should be for the Secretary. There is no evidence that would prevent the entry of summary judgment against Valley on this defense, even assuming, contrary to the weight of reality, that the allegedly exculpatory letter was an official correspondence from the DOL.

In any event, Bartlett's communications were with Patterson, not Webster & Sheffield, which was Valley's ESOP counsel. The fiduciary obligation to conduct or at least have their own counsel conduct an inquiry does not allow an ESOP trustee to rely on an opinion as to the legality of the transaction by another party in interest to the transaction whose interest is potentially, if not always actually, opposed to that of the ESOP. They cannot reasonably rely on the representations of another party's counsel when they, and not the other party, represent the ESOP.

Any contact with the Department prior to the closing of the Kroy LBO transaction omitted any mention of Valley's role as ESOP trustee and that Valley had no role whatsoever in the so-called "informal review" process. Valley cannot now claim protection from this suit because of the alleged existence of a process in which they did not participate.

Joseph Simone, the Patterson attorney who represented the Kappa Acquisition Corporation, said he did not recall telling anyone at the DOL prior to Dec. 23, 1986, that Valley was the ESOP trustee. (Simone Deposition of March 26, 1992, at 287 (Simone Dep.), Appendix C to the Secretary's Response to Valley's Rule 3(g) Statement). Simone testified at deposition that Patterson did not, in their pre-closing "informal review", request that the Department review Valley's conduct. (Simone Dep. at 287–88). The so-called "no action letter" sent by Patterson was dated December 15, 1986, while Valley did not become trustee of the ESOP until December 16 or 17, 1986. (Gunderson Dep. of June 25, 1987, 31–32, Ex. 19 to Valley's Response to the DOL's Rule 3(g) Statement).

Since Valley did not contact the DOL on their own behalf, they cannot now assert that the DOL approved of their conduct. (Gunderson Dep. of February 6, 1991, 67–68). Even if they had, however, the fact that no such review process exists would mandate the entry of summary judgment against them.

Even Gunderson admitted that no one had ever said that the DOL "approved" the transaction. (Gunderson Deposition of February 6, 1991, at 76 (Gunderson Dep.) attached as Appendix E to Secretary's Response to Valley's Rule 3(g) Statement; Gunderson Dep. of February 3, 1992, at 181–82). Gunderson testified at deposition that he had never been told that Department had a practice of issuing formal approvals of ESOP transactions. (Gunderson Dep. of February 6, 1991, at 64; Gunderson Dep. of February

1312

3, 1992, at 185; Gunderson Dep. of February 6, 1992, at 66–67).

Additionally, Scott Spector, counsel for the ESOP trustees, testified that he never told Gunderson that the Department had approved the Kroy LBO. (Spector Dep. of January 24, 1991, at 100, App. D to Secretary's Response to Valley's Rule 3(g) Statement). Gunderson testified that no one told him that the transaction had been approved by the Secretary. (Gunderson Dep. of February 6, 1991, at 76–77, App. E to id.). This defense is also dismissed.

### E. Due Process (Fifth Affirmative Defense)

For the same reasons expressed above in connection with Valley's Due Process Counterclaims, summary judgment should be granted to the Secretary dismissing Valley's affirmative defense of Due Process.

### CONCLUSION

Judgment on all motions is for the Secretary. Submit Order on 30 days notice.